[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 227.]

THE STATE OF OHIO, APPELLEE, *v.* YARBROUGH, APPELLANT.

[Cite as *State v. Yarbrough*, 2002-Ohio-2126.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 1999-0958—Submitted November 27, 2001—Decided May 15, 2002.)

APPEAL from the Court of Appeals for Shelby County, No. 17-97-03.

_____

ALICE ROBIE RESNICK, J.

{¶1} Appellant, Kevin Yarbrough, was convicted of the aggravated murder for hire of Wilma Arnett, an informant for the Shelby County Sheriff's Department and state's witness in the prosecution of Calvin Davis and his drug-dealing ring. The trial court sentenced appellant to death. We affirm.

{¶2} At the time of Wilma Arnett's murder, Calvin Davis was the central figure of a Shelby County narcotics ring. He had formerly headed a door-to-door "gypsy" painting crew in Georgia; appellant had worked on his painting crew during 1991 or 1992.

{¶3} Wilma Arnett was the sister of Calvin Davis's wife, Jewel. Arnett lived in Sidney, the Shelby County seat. For a number of months, Arnett had been a police informant in local drug cases. From September 1993 to January 1994, Arnett made controlled drug purchases under the supervision of detectives while wearing a hidden recorder and transmitter.

{¶4} In February 1994, a grand jury indicted Calvin Davis and fourteen others for aggravated drug trafficking. Calvin Davis's codefendants included Tyrone McGhee and Jermaine Jelks, two members of Calvin Davis's drug ring. After Calvin Davis received discovery from the state, he told his wife that Arnett "had to go."

**{¶5}** Appellant's girlfriend, Elizabeth Johnson, had a conversation with Calvin Davis in late 1993 or early 1994. An enraged Calvin Davis told her that Arnett had "set him up" and that he would "go to prison for 15 years" because of Arnett's betrayal. Arnett had left a message on Calvin Davis's answering machine threatening to inform the police about his drug dealing unless Calvin Davis paid her off, and Calvin Davis played the message for Johnson. Calvin Davis told Johnson that "before he gave [Arnett] any more fuckin' money, he'd have her killed or kill her himself."

**{¶6}** In May 1994, Calvin Davis summoned appellant to Shelby County. On May 2, Calvin Davis paid for a bus ticket in the name of Elizabeth Johnson to take appellant from Augusta, Georgia, to Sidney, Ohio. Davis arranged for Johnson to pick it up at the Augusta bus station. Johnson picked up the ticket, gave it to appellant, and put him on the bus. Although the ticket entitled appellant to ride all the way to Sidney, he got off the bus in Cincinnati. Calvin Davis, along with Davis's wife and a friend, picked him up there and drove him to Sidney. Calvin Davis later introduced appellant to Tyrone McGhee as "my boy." While in Sidney, appellant supported himself by dealing drugs in association with Calvin Davis.

**{¶7}** State's Exhibit 26, a photograph of appellant, shows a large cyst below and to the right of appellant's right eye. (Because of his distinctive appearance, appellant was nicknamed "Knothead.") Appellant no longer had the cyst by the time that he was tried, but his girlfriend testified that Exhibit 26 accurately depicted appellant's appearance—including the cyst—in May 1994.

**{¶8}** In May 1994, Calvin Davis, McGhee, and Jelks were discussing their cases with appellant in Calvin Davis's van. Calvin Davis suggested that he and McGhee "should * * * pay Kevin Yarbrough to do a hit on Wilma * * * so our drug cases would get dropped." Calvin Davis and McGhee were each to pay appellant $10,000. They drove to McGhee's house. McGhee got out of the van and came

back with a duffel bag containing $10,000 in cash. He gave the bag to appellant, who counted the money in the van.

{¶9} Annette Simmons was Calvin Davis's neighbor; originally from Georgia, she had known Calvin Davis since he was sixteen. One evening in May, while appellant was staying with the Davises, Simmons was visiting Jewel Davis. In Simmons's presence, appellant asked Calvin Davis, "[D]id you get the picture?" Calvin Davis asked his wife, "[D]o you have the picture[?]" A photograph of Jewel Davis and Wilma Arnett was removed from an album and torn or cut in half. Calvin Davis showed appellant the half depicting Wilma; then Calvin Davis pocketed it.

{¶10} On May 9, 1994, the day before Wilma Arnett's body was found, Jewel Davis saw her husband hand his .38-caliber handgun to appellant. That same day, Vicki Shawler saw "a tall black male" displaying a handgun during a party. The man was in the company of Calvin Davis, and he had a "mole" or "mark" on his face, located where appellant's cyst had been.

{¶11} At the United gas station in Sidney, Tanya Counts was working the last shift on May 9 as a cashier. During Counts's shift, which ended at 10 or 11:00 p.m. that night, Wilma Arnett came to the station three times. The first two times, she was by herself.

{¶12} Near the end of her shift, Counts saw Arnett for the third time. This time, Arnett was accompanied by a tall black man with a "bump" on his face. Arnett drove in and pumped some gasoline, and her companion came inside and paid for it. He asked Counts if the station sold beer. Counts said no, and the man left.

{¶13} Counts could not positively identify appellant as the man with Arnett. However, Counts testified that the "bump" on the man's face was in the same location as appellant's cyst shown in State's Exhibit 26.

{¶14} Just before midnight on May 9, a motorist saw Arnett's car parked at the edge of a field on Dingman-Slagle Road, outside Sidney. He saw at least one person in the car.

{¶15} Around 12:30 or 1:00 a.m. on May 10, appellant came into Walleyes Bar in Sidney to speak to Calvin Davis. McGhee, who was watching a pool game and standing near Calvin Davis, heard the conversation. Appellant approached Calvin Davis and reported, "The snitch is no more." He commented that "the bitch was hard to die." He then told Calvin Davis that he "beat her down," that he "[s]hot her once and * * * had to shoot her again because she wasn't dead the first time," and that he "threw the gun up there in the woods" near the residence of James Bussey, Calvin Davis's nephew. Appellant also said something about "the window being broke out."

{¶16} On the morning of May 10, Arnett's husband looked for her. He did not find her, but he did find her car parked in town. The windshield had been broken, scattering glass fragments on the seat and floor.

{¶17} That same morning, another motorist reported a body lying in a field on Dingman-Slagle Road, where Arnett's car had been seen at midnight. The body was later identified as Wilma Arnett. Fragments of tinted automotive window glass were found near the body.

{¶18} Arnett was shot three times in the head and three times in the body. A .38-caliber slug was recovered from Arnett's body. Semen was found on a vaginal swab taken during the autopsy. DNA analysis showed that appellant was the source of the semen.

{¶19} On the morning of May 10, Calvin Davis told his wife that he wanted appellant out of his house. Calvin Davis then went to the nearby apartment of Paul Smith, another member of his drug ring, and ordered him to "get [appellant] out of there." Calvin Davis told Smith that appellant had stolen money and crack from him.

4

{¶20} Appellant got into Smith's car with two bags, one of which was a duffel bag. Smith headed for Sidney, but appellant told him to drive to Lima instead. When they arrived, the bus station was closed, so Smith checked appellant into a motel under Smith's name. Appellant told Smith: "[T]ell Calvin where I am. Don't tell nobody else." This surprised Smith, since Calvin Davis "was supposed to be mad at" appellant.

{¶21} Three or four days after the murder, Calvin Davis told his wife that he had paid appellant $5,000 to kill Arnett and he "wasn't gonna pay any more."

{¶22} As a result of Arnett's murder, the aggravated drug trafficking cases in which she was to testify were dismissed.

{¶23} In September 1994, Detective Joanie Henry of the Shelby County Sheriff's Department interviewed appellant in South Carolina. At first, appellant told Henry that "he had heard of the murder but did not know Wilma." After seeing Wilma's picture, he admitted that he had seen her at Walleyes Bar "but denied that he'd ever had any contact with her." Later, appellant admitted to Henry that he and Arnett "had had contact with each other outside Walleyes Bar within a few days [of] when he first arrived" and that he had sexual relations with Arnett. He denied being with her on the night of May 9.

{¶24} In 1995, appellant was being held in the Shelby County Jail on other charges. One day in late October or early November, appellant returned from a court appearance "excited" and "upset." He told Vance Short, a fellow inmate, that he was "afraid that he was the last person that [Arnett] was seen with." He also said, "[W]ell, I made sure that the bitch got what she deserved."

{¶25} In December 1995, a local resident found a .38-caliber revolver in a wooded area not far from the apartment complex where Calvin Davis's nephew Bussey lived. Witnesses identified that gun as belonging to Calvin Davis. It was impossible to determine conclusively that the .38-caliber slug removed from

Arnett's body was fired from that gun. However, the gun could not be excluded as the murder weapon.

{¶26} Appellant was ultimately indicted for aggravated murder with prior calculation and design in violation of R.C. 2903.01(A) with two death specifications: murder for hire pursuant to R.C. 2929.04(A)(2) and murder of a witness pursuant to R.C. 2929.04(A)(8). The indictment also charged conspiracy to commit aggravated murder, R.C. 2923.01(A)(2).

{¶27} Appellant was convicted of all charges and specifications. After a penalty hearing, the trial judge followed the jury's recommendation and sentenced him to death. The court of appeals affirmed appellant's aggravated murder conviction and death sentence. On the authority of R.C. 2923.01(G), the court of appeals reversed appellant's conspiracy conviction.

{¶28} Appellant appeals as a matter of right, pursuant to R.C. 2929.05(A) and former Section 2(B)(2)(a)(ii), Article IV, Ohio Constitution, from the judgment affirming his aggravated murder conviction and death sentence.[1] He raises eighteen propositions of law. In our judgment, none of these propositions of law justifies reversal of the conviction or sentence. We have also independently reviewed the death sentence imposed in this case for appropriateness and proportionality. For the reasons that follow, we affirm appellant's conviction and death sentence.

I. Admission of Calvin Davis's Out-of-Court Statements

{¶29} Calvin Davis died on June 1, 1996. Thus, he was unavailable to testify at appellant's trial. However, the state introduced into evidence three out-of-court statements that Calvin Davis had made between November 1993 and May

---

1. In 1994, Ohio voters approved Issue I, providing for direct appeal from common pleas court to the Supreme Court of Ohio "as a matter of right in cases in which the death penalty has been imposed." See Section 2(B)(2)(c), Article IV of the Ohio Constitution. The amendment applies only to offenses committed on or after January 1, 1995. Sub.H. Joint Resolution No. 15, Schedule, 145 Ohio Laws, Part IV, 7811, 7814. See *State v. Smith* (1997), 80 Ohio St.3d 89, 95, 684 N.E.2d 668. Since the death penalty in this case was imposed for events that occurred prior to January 1, 1995, the 1994 amendment to Section 2(B)(2) of the Ohio Constitution does not apply.

1994. In his first proposition of law, appellant contends that admission of these three statements violated the hearsay rule of the Ohio Rules of Evidence and the Confrontation Clause of the Sixth Amendment to the United States Constitution.

## A. Statement to Elizabeth Johnson

**{¶30}** Johnson testified that she and Calvin Davis had had a conversation in November or December 1993 or early in 1994. An "[e]nraged" Calvin Davis was complaining that Arnett had "set him up" and that "he'd go to prison for 15 years." Johnson then testified, "He [Calvin Davis] said before he gave her any more fuckin' money, he'd have her killed or kill her himself."

**{¶31}** Over defense objection, the trial court admitted this testimony, holding that it qualified under both the "state of mind" and the "statement against interest" exceptions to the hearsay rule, Evid.R. 803(3) and 804(B)(3), respectively. Appellant contends that Calvin Davis's statement, "before he gave her any more * * * money, he'd have her killed or kill her himself," should have been excluded.

**{¶32}** Evid.R. 803(3) creates a hearsay rule exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as *intent* * * *), but not including a statement of memory or belief to prove the fact remembered or believed * * *." (Emphasis added.)

**{¶33}** Calvin Davis's statement was a statement of his then-existing intent. " 'It has long been settled that the state-of-mind exception may be used as the basis for introducing statements showing the forward-looking intent of the declarant for the purpose of proving that he thereafter acted in accordance with that intent.' " 4 Louisell & Mueller, Federal Evidence (1980) 540, Section 442, quoted in *State v. Steffen* (1987), 31 Ohio St.3d 111, 120, 31 OBR 273, 509 N.E.2d 383. See, generally, *Mut. Life Ins. Co. of New York v. Hillmon* (1892), 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706.

**{¶34}** Although appellant calls this a hearsay issue, he does not seriously contend that Calvin Davis's statement fails to qualify for the state-of-mind

exception of Evid.R. 803(3). Rather, he argues that the statement is irrelevant to proving Calvin Davis's state of mind because it was too remote in time from the murder.

{¶35} However, it is the trial court's province to determine whether, under the circumstances, testimony is "essentially misleading or too remote" to be deemed relevant. *Whiteman v. State* (1928), 119 Ohio St. 285, 298, 164 N.E. 51. Trial courts have "broad discretion" in determining relevance, and we are correspondingly "slow to interfere" with a trial court's exercise of that discretion. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126.

{¶36} Six months at most elapsed between Calvin Davis's statement—made no earlier than November 1993—and his hiring appellant to kill Arnett in May 1994. Indeed, the trial court could have found that Calvin Davis made this statement to Johnson later than November 1993. Jewel Davis recalled that Arnett had left the phone message after Calvin Davis was indicted, which was in February 1994. Since Arnett was still making drug buys in January 1994, Calvin Davis presumably did not know in November 1993 that Arnett was working with police.

{¶37} In any case, Calvin Davis's anger at Arnett was likely still fresh in May 1994, with his trial pending. (According to Paul Smith, Calvin Davis told Jewel Davis in January or February 1994 that Arnett "had to go.") Hence, the trial court could reasonably find that Calvin Davis's statement to Johnson was not too remote to be relevant, and the court did not abuse its discretion in admitting that statement.

{¶38} Appellant further contends that the statement is irrelevant because it is not "probative of appellant's involvement." But the state never claimed that the statement directly proved appellant's involvement, and that is not the test of its probative value. Evid.R. 401 defines "relevant evidence" as "evidence having *any* tendency to make the existence of *any* fact that is of consequence to the

8

determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.)

**{¶39}** To obtain these convictions and the sentence of death, the state had to prove not only that appellant killed Arnett, but that he killed with prior calculation and design, R.C. 2903.01(A), and that he did so "for hire," R.C. 2929.04(A)(2). Calvin Davis's statement that he intended to "*have [Arnett] killed or kill her*" makes it "more probable" that appellant was *hired* to kill Arnett "than it would be without the [statement]."

**{¶40}** Finally, we reject appellant's argument that the court should have excluded the statement under Evid.R. 403(A). That rule requires a trial court to exclude relevant evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." But the exclusion of *relevant* evidence under Evid.R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place. Thus, "the trial court is vested with broad discretion and an appellate court should not interfere absent a clear abuse of that discretion." *State v. Allen* (1995), 73 Ohio St.3d 626, 633, 653 N.E.2d 675. There was no such "clear abuse" here. The statement at issue created no danger of unfair prejudice or jury confusion.

### B. Statement to Jewel Davis

**{¶41}** On direct examination, Jewel Davis testified, "Calvin stated that he paid $5,000 to Kevin to have Wilma killed. * * * He said he wasn't gonna pay any more." This statement, though hearsay, was admitted under the Evid.R. 804(B)(3) exception for statements against interest. Appellant contends first that the statement was not an admission against interest and, second, that it was not corroborated by the circumstances of its making, so that its admission into evidence also violated the Confrontation Clause of the Sixth Amendment.

**{¶42}** Evid.R. 804(B)(3) creates a hearsay rule exception for statements against interest. The rule allows admission of "[a] statement that * * * at the time

of its making * * * so far tended to subject the declarant to * * * criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

{¶43} Appellant argues that Calvin Davis's statement was not against his penal interest—i.e., it did not tend "to subject [Calvin Davis] to * * * criminal liability"—because it was privileged. Under R.C. 2945.42, with certain exceptions not relevant here, a "[h]usband or wife shall not testify concerning a communication made by one to the other * * * during coverture * * *." Thus, Jewel Davis could not have repeated Calvin Davis's admission in a prosecution of Calvin Davis. Although appellant lacks standing to assert Calvin Davis's marital privilege, see *Diehl v. Wilmot Castle Co.* (1971), 26 Ohio St.2d 249, 55 O.O.2d 484, 271 N.E.2d 261, appellant contends that, because Calvin Davis could have raised it, his statements to his wife were not against his penal interest.

{¶44} However, a statement may be against a declarant's penal interest even though it cannot be used in evidence against the declarant. The marital privilege bars only testimony; it "does not ensure that the statement will not be repeated to the police or anyone else * * *." *State v. Kiewert* (1992), 135 N.H. 338, 344, 605 A.2d 1031. By telling his wife that he had paid for Arnett's murder, Calvin Davis placed himself at serious risk of arrest and prosecution. His statement was therefore against his penal interest.

{¶45} Appellant also argues that Calvin Davis's statement was not made under circumstances suggesting that it is trustworthy. Under Evid.R. 804(B)(3), "[a] statement tending to expose the declarant to criminal liability * * * is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

**{¶46}** The existence or nonexistence of corroborating circumstances also invokes Confrontation Clause concerns. The hearsay exception for statements against interest is not a firmly rooted exception, at least when the statement is "offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." *State v. Madrigal* (2000), 87 Ohio St.3d 378, 385, 721 N.E.2d 52. See, also, *Lilly v. Virginia* (1999), 527 U.S. 116, 130-134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (plurality opinion).

**{¶47}** For this reason, the Confrontation Clause of the Sixth Amendment permits such a statement to be admitted only if it exhibits adequate indicia of reliability. *Madrigal*, 87 Ohio St.3d at 386, 721 N.E.2d 52. See, generally, *Ohio v. Roberts* (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597. Moreover, "the fact that other evidence corroborates the statement is irrelevant. * * * The relevant circumstances include '*only those that surround* the making of the statement and that render the declarant particularly worthy of belief.' (Emphasis added.)" *Madrigal*, 87 Ohio St.3d at 387, 721 N.E.2d 52, quoting *Idaho v. Wright* (1990), 497 U.S. 805, 819, 110 S.Ct. 3139, 111 L.Ed.2d 638.

**{¶48}** Relying heavily on the plurality opinion in *Lilly v. Virginia*, supra, appellant contends that Calvin Davis's statement to Jewel Davis was not surrounded by "circumstances * * * that render the declarant particularly worthy of belief." Therefore, appellant contends, the statement's admission violated his rights under the Confrontation Clause.

**{¶49}** We disagree. Calvin Davis's statement to his wife is distinguishable from the statement at issue in *Lilly* on every relevant point. This is not a case where "the government [was] involved in the statements' production." *Lilly*, 527 U.S. at 137, 119 S.Ct. 1887, 144 L.Ed.2d 117. Calvin Davis was not in custody when he made the statement, nor was he speaking "under the supervision of governmental authorities." Id. at 139, 119 S.Ct. 1887, 144 L.Ed.2d 117. Thus, he had no "natural motive to attempt to exculpate himself as much as possible" by implicating

appellant. *Id.* Nor was he "responding to * * * leading questions." *Id.* See *State v. Issa* (2001), 93 Ohio St.3d 49, 61, 752 N.E.2d 904.

**{¶50}** Nor can we accept appellant's contention that Calvin Davis was shifting blame from himself. Like the declarant in *Issa*, he "had nothing to gain from inculpating appellant in the crime." *Issa*, 93 Ohio St.3d at 61, 752 N.E.2d 904. "At best, [declarant's] statement would 'shift' enough blame so that he and [defendant] would share responsibility for the crime. [Declarant] would be exposed to an equally severe penalty on the basis of his confession alone." *People v. Petros* (1993), 198 Mich.App. 401, 416, 499 N.W.2d 784.

**{¶51}** "*Lilly*'s main concern was with statements in which, as is common in police-station confessions, the declarant admits only what the authorities are already capable of proving against him and seeks to shift the principal blame to another (against whom the prosecutor then offers the statement at trial)." *United States v. Shea* (C.A.1, 2000), 211 F.3d 658, 669. The statement in *Lilly* whose admission violated the Confrontation Clause fit that description. Calvin Davis's spontaneous statement to his wife, in his own home, with no state involvement whatsoever, does not. "*Lilly* does not change the fact that statements to close family members have 'particularized guarantees of trustworthiness.' " *United States v. Westmoreland* (C.A.7, 2001), 240 F.3d 618, 628, quoting *United States v. Tocco* (C.A.6, 2000), 200 F.3d 401, 416. See, also, *Latine v. Mann* (C.A.2, 1994), 25 F.3d 1162, 1166-1167 (distinguishing between custodial statements to police and statements to a perceived ally).

**{¶52}** Appellant goes so far as to contend that Calvin Davis's statement is unreliable because he was speaking to his wife; he argues that Calvin Davis "had every reason to believe that his conversations with his wife would never be disclosed and would never subject him to criminal liability."

**{¶53}** Although a few courts have found similar reasoning persuasive in part, see *United States v. Hoyos* (C.A.9, 1978), 573 F.2d 1111, 1115; *United States*

*v. Battiste* (N.D.Ill.1993), 834 F.Supp. 995, 1006, and fn. 11; *State v. Myers* (1981), 229 Kan. 168, 175, 625 P.2d 1111, others have not. See *Linton v. State* (Alaska App.1994), 880 P.2d 123, 127-128; *State v. Kiewert* (1992), 135 N.H. 338, 605 A.2d 1031. We believe the latter courts take the better position. "Even to people we trust completely, we are not likely to admit serious fault of which we are innocent * * *." 4 Mueller & Kirkpatrick, Federal Evidence (2d Ed.1994) 822-823, Section 496. Thus, where a declarant makes a statement to someone with whom he has a close personal relationship, such as a spouse, child, or friend, courts usually hold that the relationship is a corroborating circumstance *supporting* the statement's trustworthiness. See, e.g., *Green v. Georgia* (1979), 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738; *United States v. Tocco*, supra; *United States v. Boone* (C.A.9, 2000), 229 F.3d 1231, 1234; *Westmoreland*, 240 F.3d at 627-628.

**{¶54}** To sum up: Calvin Davis was speaking to his wife, not to police; he was at home, not in custody; his statement was spontaneous, and he had nothing to gain by incriminating appellant. These are corroborating circumstances that render his statement worthy of belief. The admission of that statement did not, therefore, violate either the Confrontation Clause or Evid.R. 804(B)(3).

### C. Statement to Jermaine Jelks

**{¶55}** Jermaine Jelks testified to a conversation that took place in Calvin Davis's van before the murder. Jelks testified that Calvin Davis "was speakin' based upon our drug cases and suggested they should * * * pay Kevin Yarbrough to do a hit on Wilma. * * * It was $10,000 apiece." Over objection, this testimony was admitted under the rule for statements by coconspirators, Evid.R. 801(D)(2)(e), and under the hearsay exception for statements against interest when the declarant is unavailable, Evid.R. 804(B)(3).

**{¶56}** The court of appeals upheld the admission of this statement to Jelks on essentially the same grounds that it upheld the admission of Calvin Davis's statement to Jewel Davis that Calvin Davis had paid appellant to have Wilma Arnett killed. We agree with the court of appeals that this statement also was admissible under Evid.R. 804(B)(3) as a statement against interest. We also agree that the corroborating circumstances render the statement sufficiently trustworthy that the Confrontation Clause was not violated.

**{¶57}** The trial court properly admitted each of the statements in question. Appellant's first proposition of law is therefore overruled.

### II. Exclusion of Hearsay—Due Process Issue

**{¶58}** In his second proposition of law, appellant contends that certain out-of-court statements by Calvin Davis should have been *admitted* as statements against interest.

**{¶59}** Appellant proffered the testimony of Kenneth Henderson, who had been in jail with Calvin Davis in November or December 1994. According to Henderson, Calvin Davis told him "that Tyrone McGhee and Jermaine Jelks and Darren Taborn killed Wilma. * * * He said that * * * they came to his house early that morning and cleaned blood off 'em or somethin'."

**{¶60}** The defense argued that Calvin Davis's statements to Henderson were admissible as statements against Calvin Davis's penal interest. The trial judge

found that no corroborating circumstances supported the truthfulness of these statements. He therefore excluded them.

{¶61} Appellant argues that the statements meet every requirement of Evid.R. 804(B)(3) and therefore should have been admitted. He further argues that excluding the statements denied him due process.

A. Evid.R. 804(B)(3)

{¶62} Calvin Davis's statement that McGhee, Jelks, and Taborn killed Arnett was clearly not against Calvin Davis's penal interest. On the other hand, his statement that McGhee, Jelks, and Taborn washed blood from themselves at Calvin Davis's house was against his penal interest, at least arguably. The statement could be construed as implying that he permitted the others to wash off the blood, which could be deemed to violate R.C. 2921.32(A), obstructing justice.

{¶63} However, the rule requires that the statement so far subjected him to criminal liability that a reasonable person would not make the statement unless true. *Issa*, 93 Ohio St.3d at 58, 752 N.E.2d 904. Appellant concedes that the statement represents an effort to shift blame to Taborn, McGhee, and Jelks. The evidence at trial shows that Calvin Davis was far more deeply involved in Arnett's murder than his statement to Henderson would suggest. A reasonable person might easily make a false statement that minimized his involvement in the offense. Compare *People v. Petros* (1993*)*, 198 Mich.App. 401, 499 N.W.2d 784.

{¶64} Moreover, there is little to indicate that the statement is trustworthy. The sole corroborating circumstance is that Calvin Davis was not speaking to police and therefore was not trying to curry favor. However, while "jailhouse *confessions* to cellmates" may be "trustworthy and admissible," we cannot say the same of a statement that *shifts* blame from the declarant to others. (Emphasis added.) *Westmoreland*, 240 F.3d at 628.

{¶65} Appellant purports to find further corroboration in the facts that Henderson and Calvin Davis were discussing their cases, that Henderson knew

15

Calvin Davis was in jail on drug charges, and that "prior indictments, convictions, or dismissals" were therefore a likely topic of conversation between them. Appellant offers no explanation of how these facts show the trustworthiness of Calvin Davis's statements. On balance, we find that the exclusion of Calvin Davis's statements comported with Evid.R. 804(B)(3).

B. Due Process

{¶66} Appellant further argues that, irrespective of whether the statements were admissible under Evid.R. 804(B)(3), their exclusion denied him due process of law. Here, appellant relies on *Chambers v. Mississippi* (1973), 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297. *Chambers* holds that due process "affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest—*their confessions*—when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.' " *Lilly*, 527 U.S. 116, 130, 119 S.Ct. 1887, 144 L.Ed.2d 117 (plurality opinion) (emphasis added), quoting *Chambers*, 410 U.S. at 300, 93 S.Ct. 1038, 35 L.Ed.2d 297.

{¶67} In this case, the circumstances surrounding Calvin Davis's statements provide no assurances of reliability remotely comparable to those in *Chambers*. There, the declarant confessed to the murder, and his confession exonerated the defendant. *Chambers*, 410 U.S. at 297, 93 S.Ct. 1038, 35 L.Ed.2d 297. But Calvin Davis's statements did not amount to a confession; he may have exposed himself to some liability, but he was accusing *other* people of killing Arnett. Furthermore, Calvin Davis's statements did not exonerate appellant; the possible involvement of three other persons in the murder hardly disproves appellant's guilt.

{¶68} In *Chambers*, the declarant's statement was corroborated both by the circumstances of its making and by other evidence.[2] 410 U.S. at 300, 93 S.Ct. 1038,

_____

2. Although "the fact that other evidence corroborates the statement is irrelevant" to the Confrontation Clause analysis when the state attempts to introduce a statement against interest

35 L.Ed.2d 297; see, also, *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738. In this case, Calvin Davis's statements were corroborated to some extent by the circumstances of their making (in that they were not made to police), but not at all by other evidence. Finally, the *Chambers* declarant was available to be cross-examined. *Chambers*, 410 U.S. at 301, 93 S.Ct. 1038, 35 L.Ed.2d 297. Calvin Davis was not.

**{¶69}** "*Chambers* was an exercise in highly case-specific error correction." *Montana v. Egelhoff* (1996), 518 U.S. 37, 52, 116 S.Ct. 2013, 135 L.Ed.2d 361 (plurality opinion). The case "establish[ed] no new principles of constitutional law" but "h[e]ld quite simply that *under the facts and circumstances of this case* the rulings of the trial court deprived Chambers of a fair trial." (Emphasis added.) *Egelhoff*, quoting *Chambers*, 410 U.S. at 302-303, 93 S.Ct. 1038, 35 L.Ed.2d 297.

**{¶70}** The quite different "facts and circumstances" of this case call for a contrary result. Unlike the trial court in *Chambers*, the court here did not apply the hearsay rule "mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038, 35 L.Ed.2d 297. Rather, the court applied the rule properly for its historic purpose: to exclude statements of dubious reliability that cannot be tested by cross-examination. Appellant's second proposition is overruled.

III. Sufficiency and Weight of Evidence

**{¶71}** In his fourteenth proposition, appellant contends that the evidence was insufficient to convict him.

**{¶72}** The state's evidence showed that Calvin Davis wanted Arnett dead and that he had brought appellant to Shelby County no more than a week before her murder. Arnett was last seen alive late in the evening on May 9, and appellant returned to Georgia the very next morning. He traveled under false names, carried

---

(*Madrigal*, 87 Ohio St.3d 378, 387, 721 N.E.2d 52), the same is not true when the defense attempts to introduce such a statement as a matter of due process. See *Chambers*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; *Green v. Georgia*, 442 U.S. at 97, 99 S.Ct. 2150, 60 L.Ed.2d 738.

no identification during his Ohio sojourn, and went out of his way to avoid the Sidney bus station.

{¶73} Jelks was present when Calvin Davis proposed that he and McGhee pay appellant to "hit" Arnett "so [their] drug cases would get dropped." Jelks saw McGhee give appellant $10,000 in a duffel bag, and he watched appellant count it. Calvin Davis told his wife that he had paid appellant $5,000.

{¶74} Appellant had a large cyst near his eye. On the night of the murder, one witness saw a black man with a "mole" or "knot" near his eye carrying a pistol. Another saw Arnett that night in the company of a black man with a "bump" near his eye.

{¶75} Later that night, McGhee was present when appellant described the murder to Calvin Davis. According to McGhee, appellant also told Calvin Davis that he "threw the gun up there in the woods" near the home of Calvin Davis's nephew. A .38-caliber pistol was later found in that vicinity; two witnesses identified that gun as belonging to Calvin Davis. Jewel Davis testified that Calvin Davis gave that gun to appellant. Calvin Davis's gun was .38-caliber; so was the bullet removed from Arnett's corpse.

{¶76} Appellant also mentioned "the window being broke out" of Arnett's car, McGhee testified. Arnett's car had a broken window when her husband found it on the morning of May 10, and broken glass was found near Arnett's body.

{¶77} Appellant was identified as the source of semen found on a vaginal swab taken during Arnett's autopsy. After initially denying to a detective that he knew Arnett, appellant eventually admitted that he had had sexual relations with her.

{¶78} On sufficiency-of-the-evidence review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶79} Appellant argues that the testimony implicating him was "contradictory and incredible." However, this contention calls for an evaluation of the witnesses' credibility, which—as we have repeatedly pointed out—is not proper on review for evidentiary sufficiency. See, e.g., *State v. Murphy* (2001), 91 Ohio St.3d 516, 543, 747 N.E.2d 765; *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶80} Appellant contends that we should not consider Calvin Davis's statements in this sufficiency review because, as appellant claims in his first proposition, they were inadmissible hearsay. He is mistaken. The statements were properly admitted, and on a claim of insufficient evidence, the reviewing court considers all the evidence admitted against the appellant at trial. See *Lockhart v. Nelson* (1988), 488 U.S. 33, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265.

{¶81} Appellant further claims that there was insufficient evidence that the murder was committed for hire. But this ignores Jelks's testimony. Jelks not only heard the conversation in which Calvin Davis hired appellant to kill Arnett, he actually saw McGhee pay his portion in cash.

{¶82} The evidence, if believed, proves that appellant killed Arnett, that he did so to prevent her testimony against Calvin Davis's drug ring, and that he did so for hire. Appellant's fourteenth proposition of law is therefore overruled.

{¶83} In his third proposition, appellant contends that his conviction was against the manifest weight of the evidence. "Pursuant to R.C. 2953.02, [this court] can overturn a conviction as being against the manifest weight of the evidence in a capital case, but only where the crime was committed after January 1, 1995." *State v. Sanders* (2001), 92 Ohio St.3d 245, 254, 750 N.E.2d 90. Arnett was murdered in May 1994. Appellant's third proposition is therefore overruled.

## IV. Venue

**{¶84}** In his eleventh proposition, appellant asserts that the trial court should have granted his motion for a change of venue because "extensive news coverage and widespread media exposure" of Arnett's murder prevented him from obtaining a fair trial.

**{¶85}** A trial court has discretion to grant or deny a change-of-venue motion; its ruling will not be disturbed on appeal unless that discretion was abused. See, e.g., *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304.

**{¶86}** Ordinarily, a defendant claiming that pretrial publicity denied him a fair trial must show that one or more jurors were actually biased. See *Mayola v. Alabama* (C.A.5, 1980), 623 F.2d 992, 996. However, "[p]rejudice is presumed * * * when pretrial publicity is sufficiently prejudicial and inflammatory and * * * saturated the community where the trials were held." *Coleman v. Kemp* (C.A.11, 1985), 778 F.2d 1487, 1490, citing *Murphy v. Florida* (1975), 421 U.S. 794, 798-799, 95 S.Ct. 2031, 44 L.Ed.2d 589; *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Estes v. Texas* (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; *Rideau v. Louisiana* (1963), 373 U.S. 723, 726-727, 83 S.Ct. 1417, 10 L.Ed.2d 663; *Mayola v. Alabama* 623 F.2d at 997.

**{¶87}** Forty-seven veniremen were individually questioned in the voir dire process. Of these, forty-six were asked about pretrial publicity. Of these, forty-two had read or heard something about the case. But although the voir dire suggests that local media gave attention to the case, the record does not demonstrate that the publicity "saturated the community." *Coleman v. Kemp*, 778 F.2d at 1490. Moreover, despite appellant's allegations of "inflammatory" media coverage, there is nothing in the record to show the *content* of the coverage.

**{¶88}** Thus, appellant has shown neither that the media coverage saturated the community nor that it was inflammatory. Absent such a showing, we have no basis to presume prejudice.

{¶89} In order to prevail on his change-of-venue claim, appellant must show that one or more of the jurors were actually biased by pretrial publicity. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749. We have closely examined the voir dire transcript, mindful that "[t]he examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community against the defendant, and whether it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion." *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

{¶90} The voir dire record shows that of the forty-two jurors who had read or heard something about the case, thirty-eight said that they had not formed a firm opinion and could base a verdict on the trial evidence. One admitted forming opinions, but she had not formed one as to the defendant's guilt or innocence, and she stated that he could set her opinions aside. Three stated that they had formed opinions they could not set aside; the trial court promptly dismissed all three.

{¶91} The United States Supreme Court has recognized that voir dire denials of bias may not always be reliable: "In a community where *most* veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and * * * may unwittingly have been influenced by it." (Emphasis added.) *Murphy*, 421 U.S. at 803, 95 S.Ct. 2031, 44 L.Ed.2d 589.

{¶92} Here, however, only three veniremen of forty-two admitted that they had formed preconceived opinions that they could not set aside. In *Murphy*, where a far larger proportion of the venire (twenty of seventy-eight) was excused for bias, the court stated: "This * * * by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed

no animus of their own." 421 U.S. at 803, 95 S.Ct. 2031, 44 L.Ed.2d 589. Thus, the trial judge here, as in *Murphy*, was entitled to rely on the truthfulness of the veniremen who stated under oath that they could be impartial.

**{¶93}** Significantly, the defense did not challenge any prospective juror for cause on the ground that the juror had been biased by pretrial publicity. In fact, defense counsel specifically "passed for cause" (i.e., declined to challenge) thirty-two prospective jurors who had heard something about the case. Compare *State v. Davis* (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099.

**{¶94}** On these facts, we cannot say that the trial court abused its discretion by denying a change of venue. Appellant's eleventh proposition is overruled.

V. Jury Selection Issues

**{¶95}** In his twelfth proposition, appellant complains about various aspects of the jury selection.

A. Motion for Individual Voir Dire

**{¶96}** The trial court allowed individual, sequestered voir dire only for pretrial publicity and death qualification issues. This was within the trial court's discretion: "There is no requirement that voir dire in a capital case must be conducted in sequestration." *State v. Fears* (1999), 86 Ohio St.3d 329, 338, 715 N.E.2d 136.

**{¶97}** Nevertheless, appellant claims that the entire venire was "tainted" by hearing the answers that two prospective jurors gave during general voir dire. When asked if he "would give a police officer more credibility simply because he's a police officer," Juror No. 48 said "Yes." Juror No. 34 was asked by defense counsel whether "sometimes the courts * * * are too soft on criminals." He said, "Yes" and explained, when asked, why he thought so.

**{¶98}** Nothing in the record indicates that the statements at issue biased the other veniremen. Absent some such indication, we decline to speculate that hearing these opinions must somehow have irretrievably tainted the other prospective

jurors. See *State v. Sanders* (2001), 92 Ohio St.3d 245, 248, 750 N.E.2d 90, citing *State v. Doerr* (1998), 193 Ariz. 56, 62, 969 P.2d 1168, and *Lucero v. Kerby* (C.A.10, 1998), 133 F.3d 1299, 1308-1309. Compare *Mach v. Stewart* (C.A.9, 1997), 137 F.3d 630 (prejudice presumed where a venirewoman made repeated, definite assertions about a factual matter about which the venirewoman happened to be an expert that was germane to the trial).

{¶99} Finally, appellant complains that the trial court "cut off" his questioning of a juror. The record does not support this claim. When defense counsel began to question Juror No. 73, counsel began with the comment, "I haven't heard from you yet today." The trial court admonished counsel: "Just because some jurors did not answer questions, I'm not going to allow you to go through and pick each one just because they didn't answer a question or raise a question. If you have a specific question to ask them, fine; but just because they haven't answered is no reason to ask them specific questions." Counsel then proceeded to examine Juror No. 73 without further interruption from the court.

## B. Peremptory Challenges

{¶100} Appellant complains that the prosecutor used peremptory challenges to exclude jurors who opposed capital punishment. Appellant did not object at trial and thus has waived this claim. See *State v. Allen* (1995), 73 Ohio St.3d 626, 629, 653 N.E.2d 675, and *State v. Lundgren* (1995), 73 Ohio St.3d 474, 484, 653 N.E.2d 304. See, also, *State v. Reynolds* (1998), 80 Ohio St.3d 670, 675, 687 N.E.2d 1358, where we rejected the claim that this practice is unconstitutional.

## C. Challenge for Cause

{¶101} On voir dire, Juror No. 16 indicated a belief that murderers should get the death penalty to protect society and stated that "probably fear in me would try [to] persuade going the other, towards death." She also repeatedly affirmed that she would set aside her feelings and consider mitigating circumstances. Appellant passed Juror No. 16 for cause, and she was seated on the jury.

**{¶102}** Appellant now contends that this juror was predisposed to vote in favor of death irrespective of mitigation and should therefore have been excused for cause. However, by declining to challenge the juror for cause, appellant waived this issue.

### D. Venire Drawn from Electors List

**{¶103}** Finally, appellant complains that the venire was drawn exclusively from registered voters rather than from licensed drivers. This, he alleges, produced a venire with no black members.

**{¶104}** Under R.C. 2313.08(B), each county may compile its jury list either (1) exclusively from the list of electors certified by the county board of elections, or (2) from that list, combined with the list of licensed drivers certified by the Registrar of Motor Vehicles. Shelby County uses the electors list.

**{¶105}** Appellant contends that drawing the venire solely from registered voters deprived him of his Sixth Amendment right to a jury drawn from "a fair cross section of the community." *Taylor v. Louisiana* (1975), 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690. See, generally, *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus, citing *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579.

**{¶106}** However, we have consistently upheld the calling of venires from voter registration lists. See, e.g., *State v. Moore* (1998), 81 Ohio St.3d 22, 28, 689 N.E.2d 1; *State v. Johnson* (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751, paragraph two of the syllabus. This practice does not systematically exclude blacks from the jury-selection process. *Moore*, supra. Moreover, appellant submitted no evidence that blacks are underrepresented in Shelby County venires, nor that the use of voter lists caused such underrepresentation. Appellant's twelfth proposition is overruled.

### VI. Instructions

**{¶107}** In his fourth proposition, appellant contends that the trial court's guilt-phase instructions were deficient as to the death specifications. According to appellant, the trial court should have defined the term "for hire" in the murder-for-hire specification and the terms "witness" and "criminal proceeding" in the witness-murder specification.

**{¶108}** Appellant did not request an instruction defining these terms. Thus, he can prevail only if the court's failure to define the terms was plain error. "Plain error is an obvious error * * * that affects a substantial right." *State v. Keith* (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47. An alleged error is plain error only if the error is "obvious," *State v. Sanders* (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. See, generally, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27-28, 759 N.E.2d 1240.

**{¶109}** "Failure of a trial court to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged does not *per se* constitute plain error under Crim.R. 52(B)." *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144, paragraph two of the syllabus.

**{¶110}** Appellant concedes that "many of the elements from the statute [delineating aggravating circumstances] are commonly understood terms." While he contends that "hire" and "criminal proceeding" are terms "open to interpretation," he does not explain how the trial court *should* have defined them, nor what incorrect meanings the jury might have given them. "Not every term or phrase in our criminal statutes possesses some hidden metaphysical legal meaning requiring lengthy instruction for a juror to understand." *United States v. Hall* (C.A.8, 1986), 801 F.2d 356, 360.

**{¶111}** It is hardly likely that the verdict hinged upon the trial court's failure to define the terms "for hire," "witness," and "criminal proceeding." Consequently,

no plain error exists, and appellant's failure to request such instructions waived the issue. Appellant's fourth proposition is overruled.

{¶112} In his tenth proposition, appellant contends that the trial court failed to give a required penalty-phase instruction. The trial court instructed:

{¶113} "You shall recommend the sentence of death if you unanimously, all twelve of you, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not so find, you shall unanimously, all twelve, recommend either life imprisonment with parole eligibility after serving 20 years of imprisonment or a life sentence with parole eligibility after serving 30 years of imprisonment."

{¶114} In *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, this court held that a jury need not unanimously reject the death penalty in order to recommend a life sentence. However, "the jury, when it cannot unanimously agree on a death sentence, [is required] to move on * * * to a consideration of which life sentence is appropriate, with that determination to be unanimous." 75 Ohio St.3d at 162, 661 N.E.2d 1030. Nothing in the above instruction is inconsistent with the holding of *Brooks*.

{¶115} *Brooks* also contains dictum urging trial courts to specifically instruct that "a solitary juror may prevent a death penalty recommendation * * *." Id.; but, see, *Jones v. United States* (1999), 527 U.S. 373, 379-383, 119 S.Ct. 2090, 144 L.Ed.2d 370; *Buell v. Mitchell* (C.A.6, 2001), 274 F.3d 337, 354-355. Appellant claims that the trial court erred by not giving such an instruction. However, he did not request it, and he therefore waived any claim he may have had to it.

{¶116} In light of what the trial court did instruct, we cannot find plain error. The court instructed: "You shall recommend the sentence of death if you *unanimously, all twelve of you*, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors." (Emphasis added.)

"When read as a whole, the trial court's instruction effectively informed the jury that a death penalty recommendation could be returned only after a unanimous vote * * *." *State v. Davis* (1996), 76 Ohio St.3d 107, 117, 666 N.E.2d 1099.

{¶117} Appellant has waived this claim, and there is no plain error. Consequently, we overrule his tenth proposition of law.

### VII. Prosecutorial Misconduct

{¶118} In his eighth proposition of law, appellant claims that prosecutorial misconduct tainted both phases of trial. Only one of the comments that he cites was objected to at trial, however. The others are waived.

{¶119} In the guilt phase, the prosecutor argues that appellant was "seen by Tanya Counts" with Arnett. Appellant's objection was overruled. Appellant claims the argument was improper because Counts did not identify him as the man she saw with Arnett.

{¶120} However, the prosecutor neither said nor implied that Counts actually identified appellant. Counts testified that the man had a "bump" on his face in the same place as appellant's. And, she added, appellant's photograph looked like the same man. From this evidence, it was reasonable to infer that appellant was the man whom Counts saw with Arnett. A prosecutor is entitled to draw reasonable inferences from the evidence. See, e.g., *State v. Waddy* (1992), 63 Ohio St.3d 424, 436, 588 N.E.2d 819.

{¶121} For these reasons appellant's eighth proposition of law lacks merit and is overruled.

### VIII. Crime-Scene Photos & Video

{¶122} Appellant did not object to the admission of the crime-scene photographs and videotape. Hence, he has waived this issue. No plain error exists; therefore, his thirteenth proposition is overruled.

### IX. Merger

**{¶123}** In his fifth proposition, appellant claims that the two death specifications arose from "one indivisible act" and therefore should have been merged. However, he did not request merger at trial. Thus, he can prevail only if he can demonstrate that not merging the specifications amounted to plain error.

**{¶124}** In the penalty phase of a capital case "where two or more aggravating circumstances arise from the same act or indivisible course of conduct, and are thus duplicative," they will be merged for sentencing purposes. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. The analysis used to determine whether two aggravating circumstances merge is the same as that used to determine whether two offenses are allied offenses of similar import. Id. at 197-198, 15 OBR 311, 473 N.E.2d 264, citing *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345.

**{¶125}** *Logan* sets forth the following test: "[I]n order for two crimes to constitute allied offenses of similar import, * * * [t]he offenses and their elements must correspond to such a degree that commission of the one offense will result in the commission of the other." 60 Ohio St.2d at 128, 14 O.O.3d 373, 397 N.E.2d 1345. Thus, the R.C. 2929.02(A)(2) specification merges with the R.C. 2929.04(A)(8) specification only if the elements of the two specifications "correspond to such a degree that commission of one [specification] will result in the commission of the other."

**{¶126}** Between the two specifications at issue here, no such correspondence exists. The R.C. 2929.04(A)(2) specification requires only that "[t]he offense was committed for hire." The elements of the R.C. 2929.04(A)(8) specification are that (1) the victim was a witness to an offense; and (2) that the purpose of the killing was to prevent the victim from testifying in a criminal proceeding.

**{¶127}** These two specifications are by no means "indivisible" even though they happen to apply to the same murder. Indeed, their elements do not overlap.

Hired killers do not solely kill witnesses, nor are witnesses killed only by hired killers. Thus, it is not the case that "commission of the one [specification] will result in the commission of the other." *Logan,* 60 Ohio St.2d at 128, 14 O.O.3d 373, 397 N.E.2d 1345.

**{¶128}** Appellant has not demonstrated that plain error occurred. We overrule his fifth proposition of law.

X. Sentencing Opinions

**{¶129}** In his sixth proposition, appellant attacks the trial court's sentencing opinion, arguing that it failed to consider mitigating factors and improperly considered nonstatutory aggravating circumstances.

**{¶130}** Appellant contends that the trial court failed to consider the mitigating factor set forth in R.C. 2929.04(B)(5): "lack of a significant history of prior criminal convictions * * *." The parties stipulated at trial that appellant's criminal record "consists of a conviction for aggravated trafficking in drugs here in this county in 1995."

**{¶131}** It is clear that the trial court did consider the (B)(5) factor: a paragraph of the sentencing opinion is devoted exclusively to appellant's record. The court concluded that it could "*give no weight* to [appellant's] lack of a significant criminal record as a mitigating factor." (Emphasis added.) "The fact that an item of evidence is admissible * * * does not automatically mean that it must be given any weight." *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.

**{¶132}** Appellant also contends that the trial court weighed nonstatutory aggravating circumstances against him. After noting that appellant "was raised in a very loving, supportive and religious family," the sentencing opinion states: "The Court finds no mitigating factors in any of the evidence produced regarding the Defendant's history or family background. If anything, *such evidence only exacerbates the Defendant's involvement in this crime*." (Emphasis added.)

{¶133} To "exacerbate" is " * * * to intensify the bad qualities of." Webster's Third New International Dictionary (1961) 790. Thus, the trial judge's use of this word may suggest that he treated appellant's family background as an aggravating circumstance. But that overlooks his use of the words "If anything" to preface the remark.

{¶134} In any case, we need not parse the sentencing opinion. The opinion of the court of appeals contains nothing to indicate that it treated appellant's background as aggravating. Hence, that court's independent review cured any error by the trial court, and so will our own independent review. See *State v. Bies* (1996), 74 Ohio St.3d 320, 325, 658 N.E.2d 754; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 422, 613 N.E.2d 212; *State v. Bradley* (1989), 42 Ohio St.3d 136, 148, 538 N.E.2d 373.

{¶135} Finally, appellant contends that the trial court should not have discussed his lack of remorse, since he did not claim remorse as a mitigating factor. See *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542. But the opinion contains no language suggesting that the court used this as an aggravating circumstance. Rather, the court was simply noting the absence of a possible mitigating factor. Appellant's sixth proposition is overruled.

{¶136} In his seventeenth proposition, appellant claims that the court of appeals "refused to consider" the R.C. 2929.04(B)(6) mitigating factor. R.C. 2929.04(B)(6) requires that "[i]f the offender was a participant in the offense but not the principal offender, [the court shall consider] the degree of the offender's participation in the offense and * * * in the acts that led to the death of the victim." The court of appeals found the (B)(6) factor "entitled to no weight" because "a jury convicted appellant of aggravated murder as well as two death penalty specifications."

{¶137} Even though the guilty verdict did not entail a specific finding that appellant was the principal offender, the (B)(6) factor does not apply, since the

evidence clearly indicates that appellant was the principal offender. For that reason, the court of appeals' assignment of no weight to the (B)(6) factor was not error. Appellant's seventeenth proposition is without merit and is overruled.

### XI. Ineffective Assistance

{¶138} In his sixteenth proposition of law, appellant contends that his trial counsel failed to render effective assistance.

{¶139} Ineffective assistance claims are governed by a two-part test. To prevail, the defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. See *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Williams v. Taylor* (2000), 529 U.S. 362, 390-391, 120 S.Ct. 1495, 146 L.Ed.2d 389; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶140} First, appellant contends that, since this case involved a white victim and black defendant, his counsel should have questioned veniremen on their racial attitudes *during individual, sequestered voir dire*. Counsel did question the panel about racial attitudes during general voir dire. However, appellant argues that this topic is so sensitive that jurors will not answer questions about it honestly in the presence of other veniremen.

{¶141} However, appellant ignores the fact that his counsel requested individual, sequestered voir dire, and the trial court denied the motion. Consequently, appellant's counsel did not have the opportunity to query jurors in sequestration with regard to subjects other than pretrial publicity and death-qualification. Counsel can hardly be blamed for following a procedure ordered by the trial court.

{¶142} Second, appellant contends that his counsel should have tried to impeach Jermaine Jelks with prior inconsistent statements. However, those

statements are not in the record before us. Hence, appellant cannot show either deficient performance or prejudice.

{¶143} Finally, appellant contends that his counsel failed to object to eight alleged errors. Five of his proposed objections, however, would have been contrary to existing law. See *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50 ("recommendation" instruction); *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345 (merger); *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604 (reasonable doubt instruction); *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643 (purpose instruction); *Tuilaepa v. California* (1994), 512 U.S. 967, 976, 114 S.Ct. 2630, 129 L.Ed.2d 750 ("nature and circumstances" instruction); *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596 (same).

{¶144} Regarding counsel's failure to request an instruction defining "for hire," "witness," and "criminal proceeding," appellant fails to show prejudice. Since these are commonly understood terms, there is no reasonable probability that, had they been defined, the trial's outcome would have been otherwise.

{¶145} Regarding counsel's failure to request an instruction that a single juror may block a death sentence, see *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030, appellant fails to suggest how he was prejudiced by the lack of such an instruction.

{¶146} Regarding counsel's failure to object to the gruesome crime scene photos and videotape, there was no prejudice. Since the photos and video had legitimate probative value, there is no question that some of them would have been admitted. An objection would have done little more than eliminate some duplicative photos. The evidence against appellant was strong. The prosecutor did not use the gruesome images to inflame the jury. There is no reasonable likelihood that the result of the trial would have been otherwise had counsel objected to the photos and tapes.

{¶147} Appellant's sixteenth proposition is without merit and is overruled.

## XII. Settled Issues

{¶148} Appellant's ninth proposition, in which he claims that the trial court erred by calling the jury's recommendation a "recommendation," is summarily overruled. See, e.g., *State v. Mitts* (1998), 81 Ohio St.3d 223, 232-233, 690 N.E.2d 522. Additionally, his eighteenth proposition, which questions the death penalty's constitutionality, is without merit and is also overruled.

## XIII. Independent Sentence Review

{¶149} In his seventh and fifteenth propositions, appellant contends that the death sentence in this case is inappropriate, excessive, and disproportionate.

{¶150} Under R.C. 2929.05, we must independently reweigh the aggravating circumstances against the mitigating factors submitted by appellant. The aggravating circumstances are murder for hire and murder of a witness to prevent her testimony. The evidence is sufficient to prove these circumstances beyond a reasonable doubt.

{¶151} During appellant's case in mitigation, three members of his family testified: his older brother, Sam Yarbrough, Jr., his sister, Virginia Martin-Brown, and his aunt, Evelyn Stringer.

{¶152} Appellant, born in 1958, was 36 when he murdered Arnett. Although he was raised in public housing, his relatives testified that the area was not a high-crime area. Appellant's sister, Virginia, recalled the neighborhood as "a big extended family." She remembered "everybody being [her] mother and brothers and everybody being [her] father. * * * And when we got out of school, if our parents worked, somebody else's parents would say * * * don't do this, don't do that; and they watched after us as a unit."

{¶153} Appellant's father was an alcoholic whose spending on liquor created friction. His parents broke up in 1965. Four years later, when appellant was about 11, his mother died. His grandmother then cared for him and his siblings.

Appellant's grandmother attended church regularly, worked hard, was a good person who knew right from wrong, and raised the children with sound values.

{¶154} Appellant's relatives described him as a "happy-go-lucky" child, "mischievous" but respectful, "never * * * mean" or quarrelsome. In school, he was learning-disabled but displayed no behavior problems.

{¶155} As an adult, appellant was a hard worker, capable of exercising responsibility. His brother Sam, a carpenter who frames houses, let him supervise other workers because he could be trusted to make sure a job was done right.

{¶156} Appellant had two sons by different mothers. Although he lived full-time with neither, he was a caring father who took time to involve himself in his sons' lives, attending parent-teacher conferences and making sure that they had clothes for school.

{¶157} Appellant's relatives unanimously declared that murder and involvement with drugs were out of character for him. He was never in trouble except for a traffic ticket.

{¶158} The defense also presented Dr. Douglas Johnson, a psychologist. Johnson interviewed appellant four times, gave him tests, reviewed school and court records, and talked with his family.

{¶159} Appellant's school records indicated his placement in a program for the learning-disabled; Johnson speculated that he may have been classified as "educationally mentally retarded," although Johnson's testing did not "put him quite into that category." Appellant's performance IQ was 93 on the Wechsler scale, 7 points below normal; his verbal IQ was 82. He reads below a third grade level. His IQ and reading level were consistent with a learning disability. However, his ability to "figure things out" was "fairly good."

{¶160} Johnson found appellant to be moderately depressed, seeing himself as a chronic failure. According to Johnson, depressed people often pursue "illicit

activity" because they think, "Well, what's the difference what I do, everything I do ends in failure * * * anyway."

{¶161} Appellant also displayed elevated "psychopathic deviate" and paranoid scales and an elevated "hysterical conversion" scale, indicating a tendency to "overreact * * * to threats and issues."

{¶162} Johnson described appellant as "rather passive," "nonviolent," lacking initiative, and inclined to "go along * * * and try to please people." But he was also "very distrusting" and had a "very high autonomy scale," indicating a high degree of independence. His personality profile indicates a tendency to feel "trapped, bitter, resentful," and "vulnerable."

{¶163} Johnson felt that the crimes that appellant committed were somewhat out of character for him and that appellant's passivity would probably make him "a model prisoner."

{¶164} Appellant's history or background is entitled to no mitigating weight. Nothing in his environment predisposed him to crime. Although he lost his parents, he lived in a close-knit neighborhood that functioned like an "extended family," and his grandmother instilled sound values.

{¶165} Certain elements of appellant's character deserve some weight as mitigating factors. The evidence indicates that the crimes that he committed in this case are out of character. With his passive, nonviolent nature and capacity for work, he may adjust well to prison, as Dr. Johnson suggested. On the other hand, it is questionable whether a "trapped, bitter, resentful" and "distrusting" prisoner with a high autonomy scale and a tendency to overreact will really be, in Dr. Johnson's words, a "model prisoner." In the end, Dr. Johnson's prediction, and appellant's character, carry little weight.

{¶166} Appellant does not claim, nor does the record suggest, the applicability of any factors set forth in R.C. 2929.04(B)(1) through (B)(4). He does contend that he "lack[s] * * * a significant history of prior criminal convictions and

delinquency adjudications," R.C. 2929.04(B)(5). However, inasmuch as appellant was convicted in 1995 of aggravated drug trafficking, we find that R.C. 2929.04(B)(5) does not apply.

{¶167} Under R.C. 2929.04(B)(6), "[i]f the offender was a participant in the offense but not the principal offender," the sentencer must consider "the degree of the offender's participation in the offense and * * * in the acts that led to the death of the victim" as a mitigating factor. Appellant argues that this mitigating factor applies to him, as he claims that he was "only a participant" in the murder and that Calvin Davis and McGhee were "more culpable" than he.

{¶168} However, by its terms, the (B)(6) factor applies only to a defendant who was "not the principal offender," i.e., the actual killer. In the penalty phase, the defendant has the burden of proving, by a preponderance of the evidence, the existence of mitigating factors. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 171-172, 15 OBR 311, 473 N.E.2d 264. Thus, the (B)(6) factor does not apply unless a preponderance of the evidence shows that he was "a participant in the offense but not the principal offender."

{¶169} No evidence suggests that appellant was not the actual killer; in fact, the evidence overwhelmingly proves that he was. Two witnesses testified that appellant admitted shooting Arnett. Appellant was given a photo of Arnett before the murder, he was the last person seen with Arnett, and he was seen with Calvin Davis's gun, which was later found near the murder scene. Appellant admitted to having sexual relations with Arnett, and his semen was found in her body at the autopsy.

{¶170} Nor is there any evidence that appellant was, as he claims, "manipulated by powerful local drug dealers." The record does not support the statement in appellant's brief that he was lured to Ohio by "the promise of a painting job." Calvin Davis and McGhee did not, so far as the evidence shows, "manipulate" appellant. Compare *State v. Lawson* (1992), 64 Ohio St.3d 336, 352, 595 N.E.2d

902. They simply offered him money in exchange for murder. He accepted. That is not a mitigating factor but the essence of the murder-for-hire aggravating circumstance.

{¶171} Moreover, appellant's role in the crime belies any suggestion that his participation was merely a matter of "going along." His role was too active for that. To begin with, the evidence suggests that he personally killed Arnett. In addition, he apparently got to know her and worked his way into her confidence before he killed her: she was seen in his company on the last night of her life, and at some point he had sexual intercourse with her.

{¶172} Finally, the record affords no glimpse of appellant's taking orders from anyone; he appears to have been more analogous to an independent contractor than an employee of the Davis gang. Indeed, the record shows him *giving* orders to Paul Smith on the day after the murder. We find that the (B)(6) mitigating factor is absent.

{¶173} The aggravating circumstances of murder for hire and witness-murder carry great weight, and appellant's mitigation is distinctly unimpressive. Accordingly, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶174} The death sentence is proportionate to those approved in other murder-for-hire cases, see *State v. Issa* (2001), 93 Ohio St.3d 49, 752 N.E.2d 904; *State v. Getsy* (1998), 84 Ohio St.3d 180, 702 N.E.2d 866; *State v. Davis* (1991), 62 Ohio St.3d 326, 581 N.E.2d 1362; *State v. Williams* (1988), 38 Ohio St.3d 346, 528 N.E.2d 910, and in other witness-murder cases, see *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 744 N.E.2d 163; *State v. Smith* (2000), 87 Ohio St.3d 424, 721 N.E.2d 93; *State v. Coleman* (1999), 85 Ohio St.3d 129, 707 N.E.2d 476.

{¶175} For the foregoing reasons, we affirm appellant's convictions and death sentence.

Judgment affirmed.

M<small>OYER</small>, C.J., D<small>OUGLAS</small>, F.E. S<small>WEENEY</small>, C<small>OOK</small> and L<small>UNDBERG</small> S<small>TRATTON</small>, JJ., concur.

P<small>FEIFER</small>, J., concurs in judgment.

—————————————

James F. Stevenson, Shelby County Prosecuting Attorney, and Michael F. Boller, Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, Ohio Public Defender, Stephen A. Ferrell and Tracey A. Leonard, Assistant Public Defenders, for appellant.

—————————————