OPINION
{¶ 1} Defendant-appellant, Fred Woodard ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas. For the following reasons, we affirm.
 {¶ 2} A Franklin County Grand Jury indicted appellant on four counts of aggravated murder, with specifications, in violation of R.C. 2903.01, one count of *Page 2 
aggravated burglary, in violation of R.C. 2911.11, one count of aggravated robbery, in violation of R.C. 2911.01, and one count of kidnapping, in violation of R.C. 2905.01.
 {¶ 3} Following a jury trial on these charges, the jury returned guilty verdicts on all counts and specifications. The trial court sentenced appellant to life imprisonment without the possibility of parole.
 {¶ 4} Appellant filed a timely appeal of his conviction and sentence, and he raises the following assignment of error:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 5} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus;Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility *Page 3 
when reviewing a sufficiency of the evidence claim); State v.Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 6} In contrast, in determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror."State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'"Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v.Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quotingState v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 7} With these principles as our guide, we turn to the evidence presented in this case.
 {¶ 8} Diana Winters testified that, on March 6, 2003, she and her son attempted to contact Winters' 63-year-old mother, Nancy Beamenderfer, by telephone, but the line was busy. After several attempts over a period of about three hours, Winters drove to Beamenderfer's home. Upon arrival, Winters found the house dark, and Beamenderfer's car was not in the driveway. She removed mail from the mailbox and *Page 4 
circular ads from the door. Winters entered the home through an unlocked back door, found her mother's purse and other items out of place and a kitchen drawer open, and, ultimately, found her mother's body lying on the floor. With the assistance of a neighbor, Winters called 911.
 {¶ 9} Richard Miller, Beamenderfer's boyfriend, testified that Beamenderfer helped him with his trucking business. He testified that she kept the books for the company and that she had a Miller Trucking debit card she could use to purchase supplies. She never used that debit card, however. She did not know the personal identification number ("PIN"), and she kept the card in her bedroom. After Beamenderfer's death, Miller went to the issuing bank to terminate the debit card, and he learned that someone had attempted to use the card twice on the night of March 5, 2003. Other witnesses testified that these attempts occurred at about 9:51 p.m. at a Fifth Third Bank automated teller machine ("ATM") inside a Kroger store on Eakin Road, which is on the west side of Columbus, and at 10:07 p.m. at a National City Bank at West Broad Street and Central Avenue, which is also on the west side. The attempts were unsuccessful because the user did not provide the correct PIN.
 {¶ 10} Miller testified that he had last spoken to Beamenderfer by telephone on March 5, 2003, and telephone records showed the time of the call as 7:41 p.m. Miller also testified that he gave Beamenderfer a gold ring for Christmas the year prior to her death, following a break-in at her home in which her jewelry was stolen. The ring had two hearts on it, and he identified it from an exhibit.
 {¶ 11} Plaintiff-appellee, the State of Ohio ("appellee"), introduced evidence concerning the victim, Beamenderfer. Upon discovery, she had two cords, one *Page 5 
electrical and one from a telephone, around her neck and body. There was a laceration on her neck. Police later recovered her car, which had been abandoned on East North Broadway in Columbus.
 {¶ 12} Appellant's sister-in-law, Regina Woodard, testified that she drove appellant to an interview with police in March 2003. Regina testified that, immediately following the interview, appellant told her that "they had a picture of him at an ATM." (Tr. at 342.) Appellant also called someone named "B.K." and "asked did he still have some cards." (Tr. at 343.) In a May 2004 written statement, Regina had also stated that appellant called B.K. about getting "rid of the knives." (Tr. at 361.)
 {¶ 13} Regina testified that appellant told her about being at the victim's home on the night of the murder. According to Regina, appellant stated that he went to the victim's house with his uncle, Stewart, and that he did not know anyone would be there. Appellant heard noises in the other room and found that the victim had been beaten.
 {¶ 14} Although Regina testified that police had not threatened her, on cross-examination, she admitted that the detectives yelled and screamed at her. They also told her they would bring charges against her for allegedly forging a signature on a credit card receipt. Regina provided information about appellant only after several interviews with police. On cross-examination, Regina answered in the affirmative when defense counsel asked her if she provided information only after she "[c]ouldn't take it no more. They broke you down, didn't they?" (Tr. at 410.)
 {¶ 15} Joshua Hodson, a former forensic audio-video supervisor with the Ohio Organized Crime Commission, compared police photographs of appellant with photographs from the ATM inside the Eakin Road Kroger store on the night of March 5, *Page 6 
2003. While placing one image over the other, he testified that there was little change to the facial structure, nose, and mouth in the images. On cross-examination, Hodson testified: "[T]he image on the left and the image on the right are very similar." (Tr. at 482.) On re-direct examination, Hodson testified:
 There are similarities between the picture, the image on the left and image on the right. I cannot say for certain that they are the same, the person on the left is the person on the right. All I can say is physical characteristics, based on my observations of the images, drew me to the conclusion that they are extremely similar.
(Tr. at 485.)
 {¶ 16} Former Deputy Coroner Dorothy Dean testified concerning the autopsy she performed on the victim in March 2003. Dr. Dean concluded that the victim died from knife wounds to her neck. Dr. Dean also described the injuries the victim suffered: her throat had been cut; she had been struck on the head and, following that, her neck had been broken; she had been strangled; her left wrist had been bound; and she had suffered minor injuries to her elbows and hand. Although Dr. Dean could not testify as to the order in which these injuries occurred, she could determine that the cut to the throat was the last injury, and that injury killed her.
 {¶ 17} Reynold (also identified later in the record as Raymond) Ellis, an inmate at a federal penitentiary, testified about conversations he had with appellant when they were in the county jail together in 2005. According to Ellis, appellant "[s]aid he didn't actually do it but he was present." (Tr. at 524.) Ellis also stated that appellant admitted to taking a debit card, jewelry, cell phone, and a car; police had a photograph depicting half of appellant's face while he withdrew money from an ATM; appellant had withdrawn $400 at a time from the victim's account; and the victim's car had been dropped off *Page 7 
somewhere on the west side. Ellis stated that he was not getting anything in exchange for his testimony. On cross-examination, however, Ellis admitted that he was waiting for resentencing on federal charges and that his cooperation in this case could reduce his sentence on those charges.
 {¶ 18} Robert Jackson, an inmate in an Ohio prison, testified about his contact with appellant when they were in the county jail together in 2005. According to Jackson, appellant "told me he did it, how he did it." (Tr. at 580.) Jackson stated:
 He told me on the day him and his friend went to the house, they knocked on the door. They said when she opened the door they forced her in, tied her up. They started taking whatever they wanted. They went to her purse, took her credit cards, ATM cards out. Asked for the ATM number. She wouldn't give it to them, so they taking turns stabbing her until they got a number out of her.
 [Appellant] told me that he went to the ATM to get the cash out. When he went to the ATM it didn't work. So he came back mad and they began again stabbing, kicking her, beating her, so she eventually died.
(Tr. at 581.)
 {¶ 19} Jackson also stated that appellant admitted to taking the victim's car, cell phone, and some jewelry. Jackson stated that he was getting nothing in return for his testimony. On cross-examination, however, Jackson admitted that he had initially contacted prosecutors about appellant's case with the hope that his cooperation would benefit him in his own sentencing.
 {¶ 20} Brian Daily, who goes by the nickname "B.K.," testified that he was acquainted with appellant. He stated that appellant gave him "[k]nives" and "[s]ome kind of card" in late winter, early spring 2003. (Tr. at 611.) He kept these things for a day or two, and then appellant retrieved them. Daily also testified that appellant said he *Page 8 
had stabbed a woman. Daily was with appellant when appellant used a bank card at a National City Bank on Broad Street.
 {¶ 21} On cross-examination, Daily stated that appellant also asked him to hold a half-ounce of marijuana. He gave police the information about the card only after they threatened to arrest and jail him. Daily also stated that the National City withdrawal occurred in June or July 2003. And he stated that appellant never called him about the card or the knives; appellant stopped by to retrieve them. Finally, he identified a gold ring with two hearts on it as a ring he had found while cleaning out an apartment and a black knife as one his brother had given him.
 {¶ 22} Witnesses testified concerning ATM withdrawals from the victim's personal checking and savings accounts after her death. The administrator of the victim's estate did not discover these withdrawals until months later, and police investigators were not aware of them until that time. State's Exhibit L contains bank records for the periods February 7 through March 6, 2003, and March 7 through April 4, 2003. These records and witness testimony indicate 16 ATM withdrawals on or after March 5, 2003 (nine of which were for $402), and two debit card purchases, one at Kroger and one at Applebee's. The first two withdrawals occurred on March 5 — one at 1435 Broad Street (the National City Bank location) and one at 2161 Eakin Road (the Kroger store). The last withdrawal occurred on March 19, 2003. Between March 5 and March 19, 2003, amounts totaling several thousand dollars were removed from the victim's accounts.
 {¶ 23} Columbus Police Officer Steve Eppert testified that the ATM photo from inside the Eakin Road Kroger store on the night of March 5, 2003, was broadcast to the public on March 18-19, 2003. Following this broadcast, the police received several tips, *Page 9 
two of which identified appellant as the person in the photo. After police contacted appellant's mother, appellant contacted police and stated he would be willing to be interviewed. Police first interviewed appellant on March 20, 2003. Eppert described appellant's demeanor at the interview as "confident, consistent, cooperative." (Tr. at 720.) However, Eppert stated that appellant gave statements in his March 20 and March 26 interviews that were inconsistent. Appellant agreed to be photographed on March 26.
 {¶ 24} Officer Eppert also testified that he recovered signed receipts for purchases made using Beamenderfer's personal debit card at Kroger and Applebee's. Eppert compared the signatures on those receipts to handwriting samples from appellant and Regina Woodard, and he testified that a document examiner identified Regina as the likely signatory. Officer Eppert admitted to threatening Regina with filing forgery and receiving stolen property charges against Regina for her alleged use of the victim's personal debit card.
 {¶ 25} In closing, appellee's counsel argued that the charges against appellant all stemmed from a theft, primarily the theft of the victim's bank cards. To link appellant to that theft, counsel emphasized appellant's identification from the ATM photo and his possession and attempted use of two bank cards — the Miller Trucking card and the victim's personal debit card. Those two cards, counsel argued, came from two different locations in the victim's house — the business card from her bedroom, the personal card likely from her purse — and, therefore, supported an inference that appellant participated in ransacking the house. *Page 10 
 {¶ 26} In response, defense counsel argued that appellant's possession of the bank cards did not establish his guilt for murder. Counsel emphasized the lack of physical evidence linking appellant to the crimes, the poor credibility of the state's primary witnesses, and their coerced testimony.
 {¶ 27} As noted, the jury found appellant guilty on all counts and specifications. Before this court, appellant argues that the evidence was insufficient to support the verdict and was against the manifest weight of the evidence. We disagree.
 {¶ 28} Appellant's primary argument is that the conviction rests on unreliable and non-credible testimony from "an old girlfriend, a man who himself was implicated in the crime, and two jail house informants." For purposes of determining the sufficiency of the evidence, however, our role is to determine only whether, if believed, the evidence would support a conviction. Here, we find that it does.
 {¶ 29} Although the witnesses disagreed somewhat in their precise versions of what occurred at the victim's house, all testified that appellant was at least present and at least participated in the robbery. Regina testified that appellant confessed to her that he participated in the robbery, but that his uncle had beaten the victim. Reynold Ellis similarly testified that appellant confessed to being present at the victim's home, but not actually killing the victim. Robert Jackson testified that appellant confessed not only to participating in the robbery, but also to beating and stabbing the victim in order to get the PINs for the debit cards. And Brian Daily testified that appellant told him that he may have stabbed someone. Whether credible or not, if believed, this evidence supports the conviction. *Page 11 
 {¶ 30} We also conclude that the weight of the evidence supports the conviction. While appellant emphasizes the unreliability of the witness testimony, appellee presented other evidence that implicates appellant, including a photo of the ATM transactions inside the Eakin Road Kroger store. Admittedly, appellee's expert could not state with absolute certainty that it was appellant in the photo, but he compared the ATM photo with a police photo of appellant and ultimately concluded that the images were "extremely similar." (Tr. at 485.) And, while appellee could present a photo from only one of 16 ATM transactions, appellee presented evidence that Regina signed receipts for purchases made with the victim's debit card. Regina testified that appellant called Daily and asked about "cards," and she gave a statement that appellant also asked Daily about knives. While Daily denied receiving a phone call from appellant, he admitted to holding cards and knives for appellant, possessing a ring that matched the description of the victim's ring, and being with appellant when appellant withdrew cash from a National City Bank. Finally, Ellis testified that appellant confessed to withdrawing money, $400 at a time, from the victim's accounts, an amount that corroborates nine of the withdrawals. The last withdrawal occurred on March 19, 2003, one day before police interviewed appellant and showed him the ATM photo. From this evidence, the jury could reasonably conclude that it was appellant in the ATM photo, that appellant possessed the victim's property on and after the last night she was known to be alive, March 5, 2003, and that appellant stole that property from the victim's home.
 {¶ 31} We also find evidence from which the jury could conclude that appellant participated in the victim's murder. While Regina and Ellis testified that appellant confessed only to participating in the robbery, Daily and Jackson implicated appellant in *Page 12 
the stabbing, which the deputy coroner testified was the injury that resulted in the victim's death. As appellant notes, there are inconsistencies in the testimony of Regina, Daily, Ellis, and Jackson. On this record, however, we cannot conclude that, while resolving those inconsistencies, the jury clearly lost its way or created such a manifest miscarriage of justice that we must reverse the conviction.
 {¶ 32} For all of these reasons, we overrule appellant's sole assignment of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 BROWN and TYACK, JJ., concur. *Page 1