OPINION
{¶ 1} Defendant-appellant, Michael L. Pleasant ("appellant"), appeals the judgments of the Franklin County Court of Common Pleas, which, following a jury trial, convicted him of aggravated robbery and failure to comply with an order of a police officer. Because we conclude that appellant received the effective assistance of counsel, that the convictions are not against the manifest weight of the evidence, and that evidence supporting the convictions was not insufficient, we affirm. *Page 2 
 {¶ 2} The Franklin County Grand Jury indicted appellant on the following charges: (1) aggravated robbery, with specification, in violation of R.C. 2911.01; (2) two counts of robbery, with specification, in violation of R.C. 2911.02; (3) felonious assault, with specification, in violation of R.C. 2903.11; and (4) failure to comply with an order or signal of a police officer, in violation of R.C. 2921.331. The Grand Jury subsequently re-indicted appellant in a separate case on the robbery counts. The trial court consolidated the cases.
 {¶ 3} A jury trial commenced on June 2, 2008. Plaintiff-appellee, the State of Ohio ("appellee"), called Detective Guy Grinstead, of the Whitehall Police Department, as its first witness. Grinstead testified to the following.
 {¶ 4} Grinstead was on patrol in the city of Whitehall on June 17, 2007. At about 1:30 a.m. on that date, he received a call that there was a robbery in progress at a Shell gas station located at the intersection of James Road and Broad Street in the city of Columbus. He received a description of what was happening, and he was told to look out for a stolen yellow taxi cab. The cab had last been seen traveling east on Broad Street. While traveling west on Broad Street, Grinstead saw a car coming toward him with no headlights on. He saw that it was a yellow cab and thought there was a "good chance" that it was the cab reported stolen. (Tr. 37.)
 {¶ 5} The cab turned southbound from Broad Street, and Grinstead followed. Although Grinstead activated his lights and siren, the cab did not stop. The cab was traveling at a high rate of speed, about 50 m.p.h. in a 25 m.p.h. zone, through a residential area, ignoring stop signs, and failing to slow down for speed bumps. When *Page 3 
the cab attempted to turn east, it crashed into the front of a house. Grinstead was directly behind the cab when the crash occurred.
 {¶ 6} Following the crash, the driver of the cab got out. At that point, as Grinstead began to exit his cruiser, he "was within 10 to 15 feet" of the driver. (Tr. 44.) The cruiser's headlights were on and pointing toward the cab. Grinstead described the driver as a light-skinned, black male with no shirt on, wearing black jeans, and having a short afro. The driver took off running.
 {¶ 7} The suspect first ran between two houses, and Grinstead followed him. The suspect ran along the street, through tall grass, and across a street to a driveway access point. At that point, Grinstead was "maybe 20 yards away." (Tr. 45.) Grinstead "never lost sight" of the suspect during the chase. (Tr. 47.)
 {¶ 8} As the suspect entered a tree line, he turned toward Grinstead and fired one shot. Grinstead knew it was a gunshot because he heard it go off, and he saw the muzzle flash. Grinstead took cover behind a building and radioed for assistance. Grinstead lost sight of the suspect as he entered the wooded area, and Grinstead did not pursue him further. Other police officers arrived, they pursued the suspect, and they ultimately apprehended him. Those officers brought the suspect to Grinstead, and Grinstead identified him as the driver of the cab. He was "100 percent sure." (Tr. 52.) At trial, Grinstead identified appellant as that same driver.
 {¶ 9} On cross-examination, Grinstead confirmed that the southbound portion of the chase, before the crash, continued for about three or four blocks. Grinstead also confirmed that, just after the crash, the cruiser's headlights and overhead strobe lights *Page 4 
were on. He said that, when he exited the cruiser, he pulled out his weapon. The area between the houses, where the suspect first ran, was darker than the crash site.
 {¶ 10} Grinstead said that he "caught a glimpse" of the suspect's face when he was driving the cab and turning southbound. (Tr. 67.) He never saw the suspect holding a gun, only the flash from the gun. When the suspect turned to fire at him, he did not turn and face Grinstead completely. The first time Grinstead got a "good look" at the suspect was when he was asked to identify the suspect after his capture. (Tr. 77.)
 {¶ 11} Jason Robinson testified to the following. Robinson was working at a Shell gas station on June 17, 2007. In the early morning hours, Robinson looked out the side window of the station and saw a man forcing a cab driver out of a cab. Robinson's view of the incident was blocked slightly, but he had a "pretty good" view of what happened. (Tr. 104.)
 {¶ 12} Robinson identified still photos taken from the station's surveillance camera. He said that the photos depicted the man who robbed the cab driver. Robinson never saw the man holding a weapon, but he did see the man's hand out and the driver leaning back. The man jumped into the cab and drove off.
 {¶ 13} Robinson subsequently viewed a photo array and identified appellant as the man who robbed the cab driver. Robinson said that he "didn't actually get a clear look at him." (Tr. 118-119.) He said that his identification of the man was "more physical than it was facial." (Tr. 119.) At trial, he could not identify appellant as the robber.
 {¶ 14} On cross-examination, Robinson confirmed that the individual he identified from the photo array "best fit the description" he remembered. (Tr. 122.) He agreed *Page 5 
that it most looked like the man who robbed the driver, but he did not "say that that is the guy." (Tr. 122.)
 {¶ 15} Abdifatah Yusuf testified that he was driving his yellow cab during the early morning hours of June 17, 2007, and he stopped at a gas station. He identified the still photos depicting the incident at the station.
 {¶ 16} Yusuf said that a man with a gun demanded money from him, and Yusuf gave him about $60. The man ordered him out of the cab and tried to punch him. The man pointed the gun at Yusuf and told him to get down on his knees. Yusuf ran behind the cab and, when the man ordered him to come back, Yusuf refused. The man circled the cab in pursuit of Yusuf, got in the cab, and then drove east on Broad Street.
 {¶ 17} Later, police officers took Yusuf to where the cab had crashed following the chase. He identified the vehicle as his stolen cab. He saw the man who had been apprehended, and he recognized him as the man who had robbed him. He stated that he recognized him because he was not wearing a shirt. He never got a good look at the man's face, however. At trial, he could not identify appellant as the robber.
 {¶ 18} Patricia Larkins testified that she was at home and awake in the early morning hours of June 17, 2007. Larkins saw the police cruiser pursuing the cab and also saw the cab crash. She saw a black man run in front of the cruiser and into the woods. She heard "[a]t least two shots." (Tr. 157.) She also saw the gun flash.
 {¶ 19} On cross-examination, Larkins confirmed that there are drug dealers in the neighborhood. She agreed that, when police pull up to a house, some people run away. She also confirmed that she did not see a gun, but she heard two gunshots and saw *Page 6 
two flashes, which were about two blocks away. She admitted that she has difficulty seeing in the dark. She wears glasses, but she was not wearing them that night.
 {¶ 20} Columbus Police Officer Heidi Dripps testified that she was on patrol in the early morning hours of June 17, 2007. She and her partner responded to a call concerning a carjacking and a police officer's pursuit of the car. Once they arrived at the area where the suspect was being pursued, Dripps' duties included setting up a perimeter. Officers were not able to find the suspect initially, but Dripps and an officer from a canine unit pursued him with a police dog.
 {¶ 21} While a number of officers searched the area, Dripps saw a man matching the suspect's description — "a male black, * * * light-skinned, no shirt." (Tr. 184.) Officers pursued him, and Dripps lost sight of him. Upon hearing heavy breathing, Dripps saw the suspect crouched down next to a chimney and a chain-link fence. One officer jumped the fence to apprehend the suspect, who was resisting. The officers maced the suspect and subdued him. The officers never found a gun, and the suspect said he did not have a gun.
 {¶ 22} On cross-examination, Dripps confirmed that, once the officers saw the suspect crouching next to the fence, the suspect did not flee. Based on police dispatch records, Dripps testified that the call that an officer was in trouble was aired at 1:55 a.m., and the call that officers had apprehended the suspect was aired at 2:29 a.m.
 {¶ 23} On re-direct, Dripps said that the suspect was breathing heavily and sweating, and he was not wearing a shirt. She talked to the suspect at the scene, and she rode with him in the paddy wagon. At trial, she identified appellant as the suspect taken into custody. *Page 7 
 {¶ 24} Columbus Police Detective George Robey testified that he arrived at the scene following the crash and the suspect's arrest. He confirmed that no shell casings were found at the scene, and no gun was found. A gunshot residue test conducted on the suspect was negative, and the single fingerprint lifted from the cab did not match appellant.
 {¶ 25} At about 5:30 a.m. on the morning of June 17, 2007, Robey interviewed appellant. Appellant waived his right to have a lawyer present. During the interview, appellant told Robey that he had been at a bar at an unknown location that evening. He met a person he knew, but could not initially name, and they decided to meet some girls at another place. The person he met at the bar dropped him off at an unknown location and said he would be back. Appellant knocked on the door of a residence, and a woman told him to wait for ten minutes. While he was waiting, the person who had dropped him off ran by him. Appellant heard a gunshot, and police converged on the area. Appellant became fearful and ran.
 {¶ 26} Appellant also indicated to Robey in a vague way that the name of the person he met that night and saw running was Jeffrey Stewart. Robey later identified a Jeffrey Stewart, who was incarcerated at the time of the incident.
 {¶ 27} Robey identified still photos of the interview. He identified a tattoo on appellant's bicep and another tattoo of the word "April" on his neck. At trial, Robey identified the same tattoo on appellant's neck.
 {¶ 28} Finally, Robey testified that he spoke by phone with a person who identified herself only as "April" and who told Robey that appellant was not guilty and *Page 8 
that a second person was involved. Although they arranged a time to meet at police headquarters, April never showed up.
 {¶ 29} Robey also prepared a photo array, which contained appellant's photo, for Robinson. In preparing the photo array, Robey attempted to match injuries to appellant's face with the other individuals in the photos. To do so, he "Photoshopped on similar scars on each one of the people." (Tr. 228.) Robinson picked out appellant as the individual who robbed the cab.
 {¶ 30} On cross-examination, Robey confirmed that six or seven officers searched the area for shell casings and that none were found. As for his search for a Jeffrey Stewart, Robey confirmed that he had only searched a database of individuals who had been arrested before.
 {¶ 31} Following this testimony, appellee rested its case. Thereafter, appellant moved for acquittal pursuant to Crim. R. 29. Appellant's counsel specifically argued that the gun specifications for the robbery charges were not based on sufficient evidence. The court denied the motion.
 {¶ 32} Mark Greene, a crime scene search unit detective for the Columbus Police Department, testified on behalf of appellant. Greene processed the cab retrieved from the scene and was able to lift only one good fingerprint. He confirmed that the gunshot residue test conducted on appellant was negative. He described normal efforts to search a crime scene and said that shell casings typically travel five to ten feet from where the firearm was fired. He confirmed that no shell casings were found at the scene. *Page 9 
 {¶ 33} Following this testimony, appellant rested his case. Thereafter, appellant's counsel again moved for acquittal, and the court denied the motion.
 {¶ 34} Following deliberations, the jury rendered the following verdicts: (1) guilty on one count of aggravated robbery, with a gun specification; (2) guilty on two counts of robbery, with a gun specification; (3) not guilty on one count of felonious assault; and (4) guilty on one count of failing to comply with an order or signal of a police officer. The trial court entered judgment and sentenced appellant to 15 years in prison.
 {¶ 35} Appellant appealed, and he raises the following assignments of error:
 ASSIGNMENT OF ERROR I
 Trial counsel provided ineffective assistance and [appellant] was denied his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.
 ASSIGNMENT OF ERROR II
 [Appellant's] conviction for Aggravated Robbery with Specification, Failure to Comply with an Order or Signal of Police Officer, and two counts of Robbery with Specification are against the manifest weight of the evidence.
 ASSIGNMENT OF ERROR III
 The trial court erred as a matter of law in denying [appellant's] motion for judgment of acquittal under Crim. R. 29, because the evidence presented at trial is legally insufficient to sustain a conviction for Aggravated Robbery with Specification, Failure to Comply with an Order or Signal of Police Officer, and two counts of Robbery with Specification.
 {¶ 36} We will address appellant's assignments of error in reverse order.
 {¶ 37} In his third assignment of error, appellant argues that his convictions were not supported by sufficient evidence. We disagree. *Page 10 
 {¶ 38} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact.Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus; Yarbrough
at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim).
 {¶ 39} Under R.C. 2911.01(A)(1), a person is guilty of robbery if he commits or attempts to commit a theft offense and has a deadly weapon on his person. Under R.C. 2911.02(A)(1), a person is guilty of aggravated robbery if he commits or attempts to commit a theft offense, has a deadly weapon on his person, and displays or uses the weapon.
 {¶ 40} Here, Yusuf testified that appellant, while holding a gun, demanded money from him, and Yusuf gave him about $60. Yusuf also testified that appellant forced him out of the cab and drove it away without Yusuf's permission. If believed, Yusuf's testimony alone was sufficient for the jury to find that appellant committed robbery and aggravated robbery. *Page 11 
 {¶ 41} Under R.C. 2921.331(B), a person is guilty of failure to comply with an order or signal of a police officer if the person "operate[s] a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." The violation is a third-degree felony if, while operating the vehicle, the person "caused a substantial risk of serious physical harm to persons or property." R.C. 2921.331(C)(5)(a)(ii).
 {¶ 42} Here, Detective Grinstead testified that he pursued the stolen cab for several blocks. During the pursuit, Grinstead activated the police cruiser's lights and siren, but appellant did not stop. Grinstead also testified that appellant was traveling through a residential area at about 50 m.p.h., ignored stop signs, and failed to slow down for speed bumps. Ultimately, the cab crashed into the front yard of a house. If believed, Grinstead's testimony alone was sufficient for the jury to find that appellant failed to comply with a police officer's signal and that he caused a substantial risk of serious physical harm to persons or property.
 {¶ 43} On these grounds, we conclude that sufficient evidence supported the jury's verdicts. Accordingly, we overrule appellant's third assignment of error.
 {¶ 44} In his second assignment of error, appellant argues that the jury's verdicts were against the manifest weight of the evidence. Again, we disagree.
 {¶ 45} In determining whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror." Thompkins at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage *Page 12 
of justice that the conviction must be reversed and a new trial ordered.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 46} First, the evidence supporting the verdicts on the robbery and aggravated robbery charges was substantial. The state presented more than 300 still photos of the robbery as it occurred and from different angles. The photos depict a man matching appellant's description approach the cab with his right hand in his pocket. The man is not wearing a shirt, and a large tattoo is visible on his bicep. The man leans into the cab's window on the driver's side, the man opens the door, and Yusuf, with his hands up, gets out of the cab. In several of the still photos, a dark object appearing to be a gun is visible in the man's right hand, consistent with Yusuf's testimony that the robber had a gun. Also consistent with Yusuf's testimony, the man pursues Yusuf, while Yusuf's hands are up, around the cab. Then the man gets into the cab and drives away.
 {¶ 47} Grinstead's testimony about his pursuit of the cab, including the circumstances of the pursuit through a residential neighborhood at high speed and his use of his lights and siren, was unequivocal. He said he saw the driver of the cab before he turned the cruiser around. He got a good look at the driver when he exited *Page 13 
the cab after the crash, and he did not lose sight of him until after the suspect shot at him. Grinstead's testimony about the suspect's use of the gun was also unequivocal. While no shell casings were found, Grinstead said that he heard the shot, saw the flash, and radioed for assistance.
 {¶ 48} Grinstead was also "100 percent sure" that the suspect he pursued was appellant. While Yusuf and Robinson could not identify appellant with certainty, both Grinstead and Dripps could. Appellant had a distinctive build, was not wearing a shirt, and had prominent tattoos. In particular, the tattoo visible on the robber's bicep matches the tattoo visible on appellant's bicep during the police interview.
 {¶ 49} Finally, appellant's story about his whereabouts that night was not credible. He could not name the bar he visited or the location where he was dropped off. While he made some suggestion that a man named Jeffrey Stewart was with him and was responsible, no other evidence corroborated that suggestion.
 {¶ 50} Based on our review of the evidence, we conclude that the jury's verdicts were not against the manifest weight of the evidence. Accordingly, we overrule appellant's second assignment of error.
 {¶ 51} By his first assignment of error, appellant argues that he received ineffective assistance of counsel. We disagree.
 {¶ 52} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and *Page 14 
deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 53} Here, appellant claims that his trial counsel was ineffective for not pursuing motions to suppress Robinson's identification of appellant from a suggestive and prejudicial photo array. Appellant also faults his counsel for not objecting to testimony concerning that identification or to the admission of the photo array. We conclude, however, that, even if we were to conclude that the photo array was suggestive — a conclusion we expressly do not reach — we would not agree that counsel's failure to pursue motions to suppress or to object to the photo array caused prejudice to appellant.
 {¶ 54} First, Robinson's pre-trial identification of appellant as the robber was not particularly helpful to the prosecution. At trial, Robinson testified that he did not make a firm identification when shown the photo array, and he could not make an in-court identification either. In the end, counsel may have concluded that Robinson's equivocation was helpful to appellant. We will not second-guess counsel's strategy for doing so.
 {¶ 55} Second, we disagree with appellant's characterization of all the other evidence — aside from Robinson's identification from the photo array — as "highly circumstantial and tenuous at best." The still photos alone could serve to identify appellant as the robber, given his distinctive build and tattoos. And testimony from Grinstead and Dripps was anything but tenuous. The state presented a logical and *Page 15 
well-supported depiction of the events surrounding the crimes, including the robbery, the pursuit of the suspect, and his apprehension. This evidence, in contrast to appellant's story about his whereabouts during the crimes, was overwhelming. We discern no basis on which we could conclude that, in the absence of Robinson's pre-trial identification, the outcome of the trial would have been any different.
 {¶ 56} We also disagree with appellant's assertion that his trial counsel failed to identify an alibi witness, the woman who called Detective Robey and identified herself only as "April." Generally, trial counsel's decision whether to call a particular witness falls within the ambit of trial strategy, and we will not second-guess that decision on appeal. State v. Reed, Franklin App. No. 08AP-20, 2008-Ohio-6082, ¶ 33. Given that appellant had a tattoo of the word "April" on his neck, counsel could have concluded that the jury would not accept any testimony from this woman as credible. Furthermore, there is no evidence from which we could determine whether counsel attempted to identify or interview April or whether her testimony would have been helpful. In short, we have no evidence on which to conclude that counsel's decision not to call April as a witness was prejudicial to appellant.
 {¶ 57} For all these reasons, we conclude that appellant received the effective assistance of trial counsel. Therefore, we overrule his first assignment of error.
 {¶ 58} In conclusion, we overrule appellant's first, second, and third assignments of error. We affirm the judgments of the Franklin County Court of Common Pleas.
Judgments affirmed.
 McGRATH and TYACK, JJ., concur. *Page 1