[Cite as *State v. C.G.*, 2015-Ohio-3254.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                     :

       Plaintiff-Appellee,                     :

                                            No. 14AP-1005

v.                                                :     (C.P.C. No. 13CR-0825)

[C.G.],                                           :     (REGULAR CALENDAR)

       Defendant-Appellant.                    :

---

D E C I S I O N

Rendered on August 13, 2015

---

*Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

*Todd W. Barstow*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, C.G., appeals from the judgment of conviction and sentence entered by the Franklin County Court of Common Pleas. For the following reasons, we affirm appellant's conviction under R.C. 2907.05, but reverse the trial court's imposition of a mandatory sentence under R.C. 2929.13(F) and order a correction of the sentencing entry to reflect the trial court's statutory findings under R.C. 2929.14(C)(4).

## I. BACKGROUND

{¶ 2} On February 15, 2013, appellant was indicted for three counts of rape, in violation of R.C. 2907.02, and two counts of gross sexual imposition, in violation of R.C. 2907.05. The indictment arose out of appellant's alleged sexual abuse of A.S., the daughter of his former live-in girlfriend. Appellant entered a plea of not guilty to all

charges and voluntarily waived his right to a jury trial, instead electing for the judge to try all counts.  The plaintiff-appellee, State of Ohio, then produced the following relevant evidence in its case-in-chief.

{¶ 3}  K.A., the fiancé of A.S.'s mother, testified that on December 8, 2012, after he inadvertently drove past appellant's home, A.S. recognized appellant's car and became distraught, exhibiting a quiet and timid demeanor, and said "I don't like [appellant]."  (Tr. 18.)  When K.A. asked her why, A.S. responded, "It starts with an R."  (Tr. 16.)  K.A. asked her the second letter of the word, to which A.S. replied, "An A."  (Tr. 16.)  K.A. called A.S.'s mother, T.W., who told him to bring A.S. home.  Once home, T.W. called the police and spoke to A.S. alone.

{¶ 4}  On cross-examination, K.A. stated that he had started dating T.W. in January 2012, and, at that time, T.W. and A.S. did not live in the house on Burrell Avenue. He described A.S. as well-adjusted and very happy for the most part, but "you could tell she * * * had something in her that was bothering her."  (Tr. 24.)

{¶ 5}  T.W. testified that she started dating appellant in the summer of 2009 and that he had stayed with her in a house on Ambleside Drive and then her house on Burrell Avenue.  T.W. initially thought that she and A.S. lived at the Burrell house from the summer of 2010 through the end of January 2011.  Later, when asked for a clarification of timing by the judge and again by counsel, T.W. indicated that she moved into the Burrell Avenue house in January 2011 and moved out in the spring when it was warm outside. T.W. confirmed that photographs of the Burrell house, time-stamped January 25 and January 28, 2011, were taken when she and A.S. moved into, rather than out of, the Burrell house.  Her relationship with appellant ended while moving out of the Burrell house, after appellant told her he was cheating on her and would be moving in with the other woman.

{¶ 6}  T.W. testified that during the time she lived in the Burrell house, appellant would stay in T.W.'s bedroom.  Due to their work schedules, appellant had the opportunity to be alone with A.S. at the house in the morning before and after school and also would occasionally drive A.S. to and from school.  T.W. thought A.S.'s behavior changed in that "[s]ometimes she would just be quiet.  She wouldn't really talk.  Some

days she would be angry. Just if you would – if you knew her, then you would see that how she was acting wasn't normal." (Tr. 39.)

{¶ 7} According to T.W., when A.S. arrived home with K.A. on December 8, 2012 after the errand, A.S was crying, hesitant, and afraid as she described seeing appellant's truck and spelling the word "rape" out to K.A. (Tr. 39-40.) T.W. called the police and took A.S. to Children's Hospital for follow-up testing and counseling. T.W. did not think A.S. had any prior sexual experience and thought that A.S. knew "what's right, what's wrong" in terms of inappropriate touching. (Tr. 40.)

{¶ 8} On cross-examination, T.W. agreed that, although she believed A.S. trusts her and understood that she should tell someone about incidents of inappropriate touching, A.S. never told her, her father, or her teachers about the incidents until December 8, 2012. She also agreed that she never suspected anything improper going on between appellant and her daughter. T.W. did not notice A.S. acting out sexually, behaving in a depressed manner, having sleep disturbances or behavior changes, or having trouble in school beyond needing language assistance. T.W. adamantly denied that appellant could have touched A.S. sexually while T.W. was in the house watching television in the living room with her friends and agreed she would have checked on A.S. if she was off by herself for an extended period of time. On redirect, T.W. admitted that it was possible that she did not notice that A.S. and appellant were together in the bedrooms.

{¶ 9} A.S. testified that her birthday is February 20, 2002. When asked what happened in the house on Burrell Avenue, A.S. testified as follows:

> A. [Appellant] would stay at the house with me and watch me.
> And every time [T.W.] would go to work, he would make me
> come in the room, watch TV with him. He -- he would pull
> down my pants and make me get on top of him.
>
> * * *
>
> He would kiss me [on the lips], and he told me that I was sexy.
>
> * * *
>
> He would stick his private up my private and clear stuff would
> come out.

Q. And when you say "private," what do you mean by that?

A. Vagina.

* * *

Q. And when you say that it was "his private," what is the word for that?

A. Penis.

(Tr. 66-67.)

{¶ 10} A.S. testified that this conduct occurred a couple of times while no one else was home and that she tried to tell her mom, but she "just couldn't let it out. It was too hard." (Tr. 67.) After seeing appellant's truck while with K.A., A.S. recounted:

I told [K.A.]. I said, "I want to tell you something." I said -- I said -- I spelled this word, but it starts with an R, and the last letter starts with a E. He was trying to figure it out, so I told him the word. I said, "raped."

(Tr. 68.)

{¶ 11} After using the written statement she provided to Children's Hospital to refresh her memory, A.S. added that appellant would take off her underwear and bra and touch those parts of her body with his penis. A.S. identified appellant in the courtroom as the person who touched her.

{¶ 12} On cross-examination, A.S. initially identified 2012 as the year appellant sexually abused her, but on redirect admitted it was confusing and hard to remember what years she lived at the Burrell house. A.S. agreed that the photographs her mother took in January 2011 depicted the house she lived in on Burrell. A.S. also agreed on cross-examination that she only told the interviewer at Children's Hospital that appellant kissed her on the lips. On redirect, A.S. confirmed that she also wrote a statement during that interview that stated more than kissing.

{¶ 13} Megan Letson, M.D., the pediatrician at the Center for Family Safety and Healing at Nationwide Children's Hospital, testified that she conducted the physical examination of A.S. on December 14, 2012 and served as a part of the team handling A.S.'s treatment and plan that day. The results of A.S.'s physical and genital exam, including

testing for trauma and infection, were completely normal.  In Dr. Letson's experience, normal physical and genital exams are "very common" outcomes for children that have been sexually abused.  (Tr. 100.)  Dr. Letson described studies and academic literature on the subject, which found that 90 to 96 percent of children who have been sexually abused, regardless of age, produce normal physical and genital exams.  To Dr. Letson, A.S.'s normal exam was "not surprising."  (Tr. 114.)

{¶ 14} Ebony Cherry of the Center for Family Safety and Healing at Nationwide Children's Hospital testified that she conducted the medical forensic interview of A.S., served as a part of the team handling A.S.'s treatment and plan that day, and personally prepared A.S.'s report, which the state submitted into evidence.  On December 14, 2012, Cherry interviewed A.S. alone, while T.W. met with a social worker.  During her "neutral" questions, where Cherry asked A.S. general questions about what she liked to do, Cherry described A.S. as smiling, engaged, pleasant, and talkative.  (Tr. 127.)

{¶ 15} When Cherry asked A.S. why her mom brought her to the doctor, A.S. responded that her mom's old boyfriend, whom she later identified as appellant, was touching her on her body, including her "bottom," which she clarified for Cherry to mean "front bottom," "front part" while gesturing toward her vaginal area.  (Tr. 129.)  According to Cherry, A.S. told her that "[h]e pulled down my pants" and "kissed me down there," which A.S. again clarified meant her "bottom," "front bottom," "front part."  (Tr. 129-30.)  Cherry also said A.S. told her appellant "smacked her butt," took her clothes off, would come in her room when her mom was watching basketball, and lay on her bed when her mom was at work.  Cherry elaborated:

> [A.S.] told me that he made her touch his private.  She said he "sticked" his tongue in her mouth.  She said that when he "sticked" his tongue in her mouth, she later called it kissing, his bottom would touch her private; and she later clarified it was his private that would touch her private.  She said when he would kiss her, he would tell her not to tell her mom.

(Tr. 130.)

{¶ 16} Cherry testified that during this description, A.S. remained engaged, but when Cherry asked her follow-up questions, her demeanor changed significantly.  At that point, A.S. put her head down, stopped being verbal, and began to cry.  A.S. did not

respond to Cherry's questions about why she was sad or whether Cherry could help her, so Cherry asked A.S. if it would help to write things down while they took a break. Cherry gave her paper and left the room. When Cherry returned, she saw that A.S. had written on the paper. Cherry read the writing on the paper out loud to A.S. to make sure it was correct. The writing, submitted into evidence by the state, states: "He stuck his private in my front and it hurted. He sticked it in the back to. It was clear stuff coming out his private. He took my shirt and bra off. He took my underwear off and all my clothes. He said that I was sexy." (State's Exhibit 5; Tr. 132.) When Cherry asked more about the written statement, A.S. "shut down" and would not speak. (Tr. 132.)

{¶ 17} Cherry testified that A.S. acknowledged that she had told her mom some, but not all, of the things that had happened with appellant. According to Cherry, it is not uncommon for a sexually abused child to disclose the abuse to someone other than a parent and to initially only partially disclose the extent of the abuse and delay full disclosure, even for years or into their adulthood. Factors contributing to delayed disclosure include the abuser threatening the child or telling the child not to tell anyone about the abuse, confusion when the abuser is someone they trust, fear that they won't be believed, and feelings of shame, guilt, and embarrassment. Triggers for disclosure, among others, may include proximity to the abuser or fear of proximity to the abuser.

{¶ 18} On cross-examination, Cherry agreed that A.S. did not describe any particular incident and did not identify threats beyond appellant telling her not to tell her mother. Cherry indicated that A.S. told her the abuse happened when she was ten years old but on redirect agreed it was common, in her experience, for young children to have trouble pinpointing dates, particularly when the abuse and disclosure happens over a period of time.

{¶ 19} The state rested its case-in-chief. Upon a Civ.R. 29 motion by the defense, the trial court dismissed the third count of rape due to "no evidence" of anal penetration. (Tr. 147.)

{¶ 20} The defense then called K.W., who testified that she began dating appellant in November 2010, became pregnant in November 2011, gave birth to appellant's son on July 27, 2012, and continued to be in a relationship with appellant at the time of trial. K.W. had personally visited the Burrell house while A.S. and her mother still lived there

and testified that T.W. moved to the Burrell address in February 2011 and moved out at the end of June 2011, the time when appellant began living with her.

{¶ 21} According to K.W., T.W is "obsessed" with appellant. (Tr. 161.) When K.W. told T.W. that she was pregnant, T.W. became frustrated with her and appellant, became "irate," and hung up on her. (Tr. 154.) K.W. testified that T.W. also called her in August or September 2012 intending to break up K.W. and appellant's relationship. K.W. added that after her baby was born, A.S. saw appellant holding the baby. On cross-examination, K.W. agreed that appellant provided financial and emotional support for K.W. and her family and that she did not want him to go to prison.

{¶ 22} Each party then rested its case. The court found appellant guilty of both counts of gross sexual imposition, felonies of the third degree, but not guilty of the remaining rape charges specific to cunnilingus and vaginal intercourse. The judge additionally entered a nolle prosequi for the rape charge specific to anal intercourse. The judge sentenced appellant to 60 months in prison for each count of gross sexual imposition, to be served consecutively to one another for a total of 10 years.

## II. ASSIGNMENTS OF ERROR

{¶ 23} Appellant raises the following assignments of error for our review:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF GROSS SEXUAL IMPOSITION AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.
>
> III. THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO MANDATORY TERMS OF INCARCERATION.

## III.  DISCUSSION

### A.  First Assignment of Error

{¶ 24} Appellant's first assignment of error challenges the sufficiency and weight of the evidence to support his convictions. Specifically, appellant calls into question evidence regarding the time period that A.S. and her mother lived with appellant at the Burrell address and the year when appellant allegedly abused A.S.  For the following reasons, we find that the evidence to convict appellant was sufficient and not against the manifest weight of the evidence.

{¶ 25} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 26} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").  Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 27} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 28} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770 (June 10, 2014), *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 29} Here, the judge convicted appellant of gross sexual imposition, in violation of R.C. 2907.05. R.C. 2907.05 states, in pertinent part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when any of the following applies:
>
> * * *
>
> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

* * *

> (D) A victim need not prove physical resistance to the offender in prosecutions under this section.

{¶ 30} R.C. 2907.01(B) defines "[s]exual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 31} The state presented the testimony of A.S., the victim of the alleged sexual abuse. At the time she took the stand, A.S. was 12 years old and the daughter of appellant's ex-girlfriend. Thus, for the purposes of the gross sexual imposition statute, any sexual contact perpetrated against her by appellant prior to her testimony would meet the statute's non-spouse and "less than thirteen" benchmarks under R.C. 2907.05(A)(4).

{¶ 32} Further, the testimony of A.S. establishes that appellant touched erogenous areas of her body for the purpose of sexually arousing or gratifying appellant. A.S. testified that appellant would touch her private parts during the time they lived in the house on Burrell Avenue when her mother left for work early. Specifically, A.S. testified that appellant "would stick his private up my private," specifying that "his private" meant penis and that her "private" meant vagina. (Tr. 66-67.) A.S. also testified that appellant would remove her bra and underwear and touch those parts of her body with his penis. According to A.S., appellant would tell her she was sexy and that during the touching "clear stuff would come out." (Tr. 66.) Therefore, the testimony of A.S. alone, if believed, is sufficient to support appellant's conviction.

{¶ 33} Appellant's conviction is likewise not against the manifest weight of evidence. As discussed, appellant's sole argument presents conflicting evidence regarding the year the abuse occurred as grounds to reverse his conviction. We disagree.

{¶ 34} A.S. testified that appellant sexually abused her while she and her mother lived in the house on Burrell Avenue. A.S. thought the abuse occurred in 2012 and had previously told the interviewer at Children's Hospital that the abuse occurred when she was ten years old. Both A.S.'s mother and K.W., appellant's long-time paramour, testified that T.W. and A.S. moved out of the Burrell house sometime in 2011, the end of June 2011

at the latest. Additionally, the state provided photographs of the Burrell house, taken by T.W., which were time-stamped at the end of January 2011.

{¶ 35} However, A.S. admitted it was confusing and hard to remember what years she lived at the Burrell house. A.S. confirmed that the photographs her mom took in January 2011 depicted the house she lived in on Burrell where the abuse occurred. In addition, a Children's Hospital expert testified that it was common for children to have trouble determining when sexual abuse occurred, particularly when the abuse happens over a period of time and the victim delays disclosure.

{¶ 36} The trial court was well aware of the conflicting evidence regarding the time frames but specifically found A.S. to be credible as to the fundamental question of whether abuse occurred. We agree. A.S.'s description of appellant's conduct remained consistent throughout her initial disclosure to K.A., her evaluation at Children's Hospital in December 2012, and her testimony in May 2014. In her descriptions, A.S. used words indicative of her young age to describe disturbingly adult sexual concepts.

{¶ 37} The testimony of T.W. and K.A. supplemented A.S.'s testimony. T.W. and K.A noticed that A.S. was not acting normal but, rather, could become quiet, like something was bothering her. A.S.'s behavior and reaction in delaying disclosure to a nonparent after seeing appellant's car was consistent with normal behavior and triggering events cited by the expert from Children's Hospital. Further, T.W. confirmed that she occasionally left for work early and came home late due to her work schedule, leaving appellant alone with A.S. at the Burrell house, which was consistent with A.S.'s description for when and where the sexual abuse occurred.

{¶ 38} Based on the record, we cannot conclude that the court as trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. As such, appellant's convictions are not against the manifest weight of the evidence.

{¶ 39} Accordingly, appellant's first assignment of error is overruled.

**B.  Second Assignment of Error**

{¶ 40} Appellant contends that his consecutive sentence is contrary to law under R.C. 2953.08(G) because the trial court did not make all the factual findings required by R.C. 2929.14(C)(4) when it imposed consecutive terms of imprisonment and failed to list

the statutory findings in its judgment entry.  For the following reasons, we disagree that the trial court failed to make the necessary findings during the sentencing hearing but agree that the trial court must correct its judgment entry to incorporate the statutory findings under R.C. 2929.14(C)(4).

{¶ 41} An appellate court may only modify or vacate and remand a sentence imposed by a trial court "if it clearly and convincingly finds either * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law."  R.C. 2953.08(G)(2).  Thus, "the record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14(C)(4) before it imposed consecutive sentences." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 28.

{¶ 42} Specifically, "[w]hen imposing consecutive sentences, a trial court must state the required findings as part of the sentencing hearing." *Id.* at ¶ 29.  The sentencing court is not required to recite the statutory language word-for-word or to state the reasons behind making the statutory findings. *Id.* at ¶ 29, 37.  Rather, "as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 43} R.C. 2929.14(C)(4) provides, in relevant part, as follows:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> * * *
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the

offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 44} The findings made by the trial court at the sentencing hearing include the following:

In quite candor, but for the child not saying the magic words necessary, I would have found you guilty of the rapes. She did not go into it in enough detail about the penetration, but that's stayed with me for a while. * * * Quite frankly, this is one of the worst ones I've seen under these scenarios.

In going through the factors, I think prison is necessary because of the seriousness of the offense in this matter. Furthermore, in looking at the requirements of 2929.14(C)(4), I feel that consecutive sentences are warranted in this situation. I feel that the factors of a continuous course of conduct were met here pursuant to Section B and that consecutive sentences are necessary to protect the public from future crimes and that it's not disproportionate to the seriousness of the offense, the offender's conduct, or the danger the offender poses to the public.

Quite frankly, if I could give you more, I would.

(Tr. 203.) The court later added, "[y]our client got off [of the rape charges] because of a lack of one little element of testimony or he'd be looking at [life]." (Tr. 205.)

{¶ 45} Appellant stipulates that the trial court made the necessary findings under the first paragraph of R.C. 2929.14(C)(4) but believes the court failed to find that either subsection (b) or (c)[1] supports the consecutive sentence. Because the trial court did not reference appellant's previous criminal conduct, subsection (c) clearly does not apply.

{¶ 46} However, the trial court expressly based its finding on subsection (b) and states that the multiple factors of this subsection were met. Moreover, we can discern from the trial court's statements regarding the seriousness of appellant's conduct and its statement indicating appellant's conduct warranted more than the ten-year sentence

[1] Subsection (a) is not relevant under the facts of this case.

maximum allowed, that the court believed the harm caused by the multiple offenses here was so great or unusual for a gross sexual imposition charge that no single prison term would be adequate. As such, we find the trial court sufficiently specified its basis for imposing a consecutive sentence under R.C. 2929.14(C)(4)(b) during the sentencing hearing.

{¶ 47} The record supports the trial court's finding. A.S. testified to a pattern of sexual abuse, where appellant would wait until A.S.'s mother left for work to abuse A.S. at the Burrell house prior to school. Based on A.S.'s testimony, the abuse occurred at least a couple of times but could have lasted as long as several months. This evidence is sufficient to establish a "course of conduct" under R.C. 2929.14(C)(4)(b).

{¶ 48} Further, the record establishes that the harm caused was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct. As noted by the trial court, the seriousness of appellant's conduct would have risen to the level of rape "but for" what the trial court believed to be a lack of detail in A.S.'s testimony regarding penetration. (Tr. 203.) In addition to the physical harm inherent in the sexual abuse described by A.S., the emotional harm of the sexual abuse is apparent in A.S.'s change of personality when addressing details of the abuse both with the Children's Hospital interviewer and before the court. Making a statement prior to sentencing, A.S.'s birth father summed up appellant's crime this way: "[H]e stole my daughter's innocence. * * * My daughter hasn't been right ever since." (Tr. 195.) The sexual abuse also occurred multiple times and was committed by someone close to the family in A.S.'s own residence.

{¶ 49} Therefore, we find that the trial court engaged in the appropriate statutory analysis for consecutive sentencing and made the findings required by R.C. 2929.14(C)(4) at the sentencing hearing, and the evidence produced at the trial of this matter supports the findings made by the trial court. As such, appellant's consecutive sentence is not contrary to law under R.C. 2953.08(G)(2).

{¶ 50} However, under this court's precedent, the trial court's sentencing entry did not properly reflect its findings under R.C. 2929.14(C)(4). Pursuant to *Bonnell*, a trial court is required to incorporate its statutory findings into its sentencing entry. *Id.* at ¶ 37. In *State v. Hillman*, 10th Dist. 14AP-252, 2014-Ohio-5760, ¶ 71, we determined that a

sentencing entry that states only that the trial court "weighed the factors as set forth in the applicable provisions of * * * R.C. 2929.14" failed to incorporate its findings into the sentencing entry.

{¶ 51} Like *Hillman*, in this case, the relevant portion of the trial court's sentencing entry states only that "the court has weighed the factors as set forth in * * * R.C. 2929.14" and is therefore insufficient to incorporate the trial court's findings. (Nov. 5, 2014 Judgment Entry, 1.)  Nonetheless, "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court."  *Id.* at ¶ 71, citing *Bonnell* at ¶ 30.  Consistent with our precedent in *Hillman*, we remand this case to the trial court to correct its sentencing entry to reflect the trial court's statutory findings under R.C. 2929.14(C)(4).

{¶ 52} Accordingly, appellant's second assignment of error is overruled to the extent it challenges the trial court's decision to impose consecutive sentences and is sustained to the extent it calls for a correction of the sentencing judgment entry.

### C. Third Assignment of Error

{¶ 53} Appellant's third assignment of error asserts that the trial court erred in imposing a mandatory term of incarceration pursuant to R.C. 2929.13(F).  The state concedes the error, and we agree.

{¶ 54} A court "speaks through its journal" entries.  *Bonnell* at ¶ 29, citing *State v. Brooke,* 113 Ohio St.3d 199, 2007-Ohio-1533, ¶ 47.  Therefore, "clerical errors may be corrected at any time in order to conform to the transcript of the sentencing hearing." *State v. Francys*, 8th Dist. No. 101069, 2014-Ohio-3597, ¶ 5.  *See also State v. Ware*, 141 Ohio St.3d 160, 2014-Ohio-5201, ¶ 16, quoting *State ex rel. Fogle v. Steiner*, 74 Ohio St.3d 158, 164 (1995) ("A nunc pro tunc entry reflects what a court 'actually decided.' ").

{¶ 55} As recognized by the state, the sentencing entry here, which states "a prison term **is** mandatory pursuant to R.C. 2929.13(F)," does not accurately reflect the non-mandatory prison sentence imposed.  (Emphasis sic.)  (Nov. 5, 2014 Judgment Entry, 1.) At the sentencing hearing, the state did not pursue mandatory sentencing and conceded that the facts of this case did not fall within the circumstances listed in R.C. 2929.13(F).

The court stated that a mandatory sentence was not likely under the facts of this case and, during the sentencing hearing, neither imposed nor notified appellant of a mandatory prison term. Instead, the court used discretionary language in imposing a prison term, stating, "I think prison is necessary because of the seriousness of the offense in this matter," which runs counter to the statutory obligation to impose prison if the circumstances in R.C. 2929.13(F) are met. (Tr. 203.) Further, the trial court did not indicate on its felony sentencing sheet that appellant's prison term was mandatory.

{¶ 56} Accordingly, we sustain appellant's third assignment of error to the extent it asks to vacate and correct the portion of the judgment entry indicating a mandatory term of prison.

## IV. CONCLUSION

{¶ 57} For the above stated reasons, we overrule appellant's first assignment of error, overrule in part and sustain in part appellant's second assignment of error, and sustain appellant's third assignment of error. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded for a nunc pro tunc entry consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded with instructions.*

BROWN, P.J., and LUPER SCHUSTER, J., concur.

_____